**ZOLAR PUBLISHING COMPANY, INC., Plaintiff-Appellant,**

v.

**DOUBLEDAY & COMPANY, INC., et al., Defendants-Appellees.**

Nos. 50, 208, Dockets 74–2526, 74–2593.

United States Court of Appeals, Second Circuit.

Argued Sept. 17, 1975.

Decided Dec. 17, 1975.

---

Stanley M. Estrow, New York City, for plaintiff-appellant.

John H. FitzSimons, New York City (Satterlee & Stephens, Robert M. Callagy, New York City, of counsel), for defendants-appellees.

Before MOORE, FEINBERG and OAKES, Circuit Judges.

MOORE, Circuit Judge:

Appellant, Zolar Publishing Company, Inc. ("Zolar") appeals from an order and judgment entered in the United States District Court for the Southern District of New York granting summary judgment in favor of defendants-appellees, Doubleday & Company, Inc., Coronet Communications, Inc., and Independent News Co., Inc. ("Doubleday") dismissing Zolar's action for copyright infringement of two books, *Zolar's Family Horoscope ("Horoscope")* and *Zolar's Encyclopedia and Dictionary of Dreams ("Encyclopedia")*. Doubleday, in turn, appeals from that portion of the order which dismisses its counterclaims against Zolar for lack of subject matter jurisdiction.

The only question before us on appellate review is whether summary judgment was properly granted. Resolution of this question depends upon whether there are genuine issues of material fact which should be resolved upon a trial. We find upon examination of the entire record that there are such unresolved issues and accordingly reverse.

HOROSCOPE

Early in 1963 there were business negotiations between Zolar and Doubleday looking toward the publication by Doubleday of the two books in question, *Horoscope*, dealing with daily astrological auguries for 1964, and *Encyclopedia*, interpreting, or possibly better, speculating upon, the significance of dreams. Zolar was represented by its president, Bruce King, and Doubleday by its employees Lee Barker and Denise Rathbun. The negotiations advanced to a point at which Ms. Rathbun, by letter dated March 18, 1963, wrote to Zolar with respect to Doubleday's prospective production of *Horoscope* and outlined with some specificity certain suggested terms, namely:

(a) An advance of $1,500.00;

(b) A royalty of 6% of retail price (retail price "would probably be 95¢");

(c) 240 pages;

(d) Each page of 400 words, 39 lines of 57 characters each;

(e) Larger pages than plaintiff's "It's All in the Stars";

(f) Pages only half the size of plaintiff's pamphlets;

(g) 8 pages devoted to front matter;

(h) 19 pages for each sign of the Zodiac;

(i) 7 pages for general characteristics;

(j) 12 pages, one page for each month;

(k) 4 pages for a general introduction; and

(*l*) November 1963, publication.

King, for Zolar, responded by letter dated March 20, 1963, in which he "accepted" the terms of Doubleday's March 18th letter, but varied it to the extent of stating that Zolar wanted "a contract for one year only" and that it would expect a 10% royalty on any ensuing editions. This exchange of correspondence was followed by a letter from Doubleday to Zolar enclosing a proposed agreement dated March 22, 1963.[1]

The agreement purported to be a licensing agreement whereby Zolar granted Doubleday the exclusive right to print, copy and vend the "work" throughout the world. The agreement established Zolar's various royalty rates, which were keyed to a multitude of discrete geographical markets, and also arranged the parties' respective rights in a host of other possible forms of publications, ranging from magazine serialization to motion picture productions. But no where in the agreement was the "work" itself identified. The preface to the contract simply referred to a "work at present entitled Zolar's Family Horoscope: A Complete Astrological Guide for the Whole Family, hereinafter called 'the work'". Aside from this introductory sentence, the lengthy agreement contained only one other cryptic reference to "complete satisfactory manuscript."

Zolar signed the agreement and Doubleday then proceeded with publication and in October 1963 submitted copies of the *Horoscope* to Zolar in a package displaying the words "What Does 1964 Hold for You?"

Apparently the reading public was more interested in pursuing its own destiny on earth in a more mundane manner than in seeking advice from the stars for the sales of *Horoscope* were far from astronomical. In response to an inquiry by Zolar as to whether Doubleday would be interested in similar works for successive years, Doubleday replied on March 7, 1964 that it was not interested in a 1965 edition. Time passed during which Zolar published and openly sold its own new edition of *Horoscope*. Doubleday was aware of Zolar's publication and advised Zolar that with respect to future editions "it does seem even more logical for you to continue publication of the new editions yourself". (Letter, Doubleday to Zolar, May 9, 1966). This Zolar did, continuing its calendar year publications of *Horoscope*.

In 1970 the stars must have augured well for the publication of horoscopes because in that year Doubleday licensed publication and distribution rights in a book similarly entitled *Zolar's Family Horoscope*. This work mirrored the book published by Doubleday for Zolar in 1964 except that it did not contain the earlier version's material which had indicated that that version was keyed to the calendar year 1964. Moreover, the front cover of the 1970 Doubleday work bore a resemblance to the competing book which Zolar had published for 1970. Upon discovery of this, Zolar notified appellees that Zolar's copyright in *Horoscope* was being infringed. It subsequently instituted this action for copyright infringement and unfair competition.

Doubleday's defense to the infringement action was that Zolar was bound by the licensing agreement dated March 22, 1963, and that that agreement authorized Doubleday to publish "the work" for the full copyright term of 28 years plus any additional renewal period. The agreement stated:

"The Publisher is hereby expressly authorized and agrees to take out copyright in the name of Zolar Publishing Company, Inc. and to take all steps required to secure said copyright . . . . . The author agrees to apply for the renewal of said copyright on

1. A. 46–49.

the expiration of the first term thereof, and authorizes the Publisher to make such application in his name. The author further agrees to assign to the Publisher, if this agreement has not terminated previously, the sole and exclusive right to print, publish, copy and vend the work, and the other rights referred to hereinafter, during the full term of said renewal, on the same terms and conditions as for the original copyright term." (A. 46)

Arguing that the contract was still in effect, Doubleday concluded that Zolar's infringement claim failed because the 1963 agreement authorized Doubleday to publish the *Horoscope* manuscript in 1970 as well as in 1964.

Zolar claimed that the restriction of the astrological data to 1964 in the 1964 edition, by itself, established the self-termination of the *Horoscope* agreement at the end of 1964. In addition, Zolar argues that both writings and statements of Doubleday's employees either amounted to a renunciation of rights to continue (tantamount to termination) or a waiver of publication rights to post-1964 editions.

■ The lower court substantially agreed with Doubleday's contentions. It relied heavily on an "integration" clause, which stated:

"This agreement contains the whole understanding of the parties." (A. 49)

After examining that clause and paragraph three of the agreement, quoted *supra*, it held that there was a duly integrated contract and that its terms were unambiguous. The district judge invoked the parole evidence rule, which precludes reference to extrinsic evidence when a contract is clear and contains all terms necessary to spell out the business transaction in issue. Consequently, the court did not consider any of the numerous letters exchanged by the parties despite the evidence of the transaction's scope, term, and subject matter contained therein. Among those excluded letters was the one which accompanied the agreement and discussed the nature of the "work" quite extensively. With-

out the benefit of this extrinsic evidence, it concluded that the contract had not been terminated and was intended to give Doubleday the right to publish *Horoscope* for the full copyright term plus any renewal period.

In reviewing the lower court decision, our only concern is whether there were genuine issues of material fact. 6 Moore's Federal Practice ¶ 56.27[1], p. 2975 (1971 ed.). *Goodis v. United Artists Television Inc.*, 425 F.2d 397, at 405 (2d Cir. 1970). Our examination of the record reveals that there were genuine issues of material fact, requiring resolution upon a trial. Standing alone the March 22nd agreement on its face does not provide a yardstick to measure the obligations assumed or performance thereof. The contract is incomplete in setting forth the parties' respective obligations. Even assuming for purposes of discussion that the actual publication in October 1963 of *Horoscope* eliminated the uncertainties as to the content of the "work", the question of the agreement's duration would remain unresolved. If this document, apparently Doubleday's standard form contract, concerned the more commonly encountered literary work whose marketability could theoretically endure indefinitely, Doubleday's arguments might have merit. But in this contract that is unclear. The document does not reveal whether *Zolar's Family Horoscope* was to be a single edition for the year 1964 or a more lasting tome designed for perennial use. If the *Horoscope* was designed exclusively for use in 1964, then the March 22nd document could reasonably be construed as being limited in duration to that year. Thus, the contract is susceptible of conflicting interpretations. In such circumstances, extrinsic evidence is required to prove which construction best comports with the parties' actual intent. *Lemelson v. Ideal Toy Corp.*, 408 F.2d 860, at 864 (2d Cir. 1969).

ENCYCLOPEDIA

As to Zolar's *Encyclopedia*, we have gleaned the following from the papers submitted below. Zolar arranged for

Doubleday to publish the *Encyclopedia* by contract dated January 21, 1963. By letter dated January 13, 1965, King asked Doubleday:

"whether or not you are going to discontinue publishing the Zolar's Encyclopedia and Dictionary of Dreams. If so, I would like to make arrangements to take whatever copies you have off your hands and have the title reverted back to me." (A. 115)

Talks between the parties ensued and they exchanged further correspondence. By letter dated March 10, 1965, Doubleday released its hardcover right in *Encyclopedia*. The letter also stated:

"We are still hopeful of making a reprint sale on the book, but if nothing happens within the next six months we will release the reprint rights to you as well." (A. 117)

By letter dated March 25, 1965, R. J. Linquist, for Doubleday, informed King, among other things, that:

"All publishing and distribution rights for this title reverted to you with the release already received from Mr. Barker [referring to March 10 letter]." (A. 118)

Another letter by Doubleday dated April 9, 1965, addressed the same topic. It informed King that Zolar could publish a hardcover edition of the work at a minimum price of $2.00 per copy and could purchase Doubleday's remaining copies of the regular trade edition of the work at a set price. It reserved all other rights in the *Encyclopedia* but stated:

"If, however, within six (6) months from date of this letter we have made no sale of the reprint rights to the Work . . . you may then request that such rights be reverted to you, at which time we will consider your request." (A. 119)

Before signing this letter as requested, King called Barker who informed him

that it meant the same thing as the letter dated March 10, 1965, and that if Doubleday failed to sell reprint rights during the next six months, all rights would revert to Zolar. King then signed the April 9th letter. More than six months after Zolar's receipt of the April 9th letter, King wrote Barker telling him that because Doubleday had not been successful in selling the paperback rights

"these rights and all other rights pertaining to this publication have of this date reverted to me." (A. 122)

In late 1970, when appellees published a paperback edition of the *Encyclopedia*, Zolar commenced this suit, asserting that its copyright in *Encyclopedia* was being infringed.

■■■ Doubleday defended on the ground that it was authorized to publish the paperbacks, that the letter dated April 9, 1965, modified the underlying contract only to the extent of hardcover rights, and that the contract had not been terminated because Zolar had not complied with certain procedures. The trial judge held that New York General Obligations Law § 15–301[2] (McKinney's 1964) governed the purported termination and concluded that since Doubleday had not consented in writing to the termination of the original contract, that contract was still effective, notwithstanding King's October 25th letter. Consequently, he held that the *Encyclopedia* copyright was not infringed because appellees had a valid contractual right to publish the paperbacks.

Summary judgment was also inappropriate on this issue. Under New York law, estoppel in appropriate cases can be invoked by a party notwithstanding his non-compliance with § 15–301. *Landau v. Ostrowe*, 50 Misc.2d 474, 270 N.Y.S.2d 722 (1966). In this case, on the basis of the exchange of correspondence about the release of the paperback rights,

---

**2.** G.O.L. § 15–301 provides in pertinent part:

"1. A written agreement or other written instrument which contains a provision to the effect that it cannot be changed orally, cannot be changed by an executory agreement unless such executory agreement is in writing and signed by the party against whom enforcement of the change is sought or by his agent."

there is an issue of fact whether Doubleday is estopped from denying that the contract had terminated. King's letter of October 25, 1965 was written after the six months' period of time for selling the reprint rights had elapsed, yet Doubleday did nothing after receiving it.

## COUNTERCLAIMS

We need only briefly discuss the trial court's dismissal of all claims sounding in unfair competition and unfair trade practices, etc. Characterizing these claims as non-Federal, it felt bound to dismiss them once it ruled against Zolar's copyright infringement claims on the merits. *United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966). Since the dismissal of the copyright claims was erroneous, that rationale is not applicable. Thus, these claims must be reinstated for further consideration by the trial court. In the light of *Gibbs, supra*, it appears that these claims are within the ambit of the District Court's pendant jurisdiction. Alternatively, some may very well be compulsory counterclaims.

## CONCLUSION

We intimate no opinion on the merits of any of the claims. In advance of such proof as may be developed upon a trial, it would be inappropriate for this Court to speculate on possible legal conclusions to be drawn therefrom.

Judgment vacated and case remanded for trial.