Michael **MEEROPOL** and Robert Meeropol, Plaintiffs,

v.

Louis **NIZER** et al., Defendants.

No. 73 Civ. 2720.

United States District Court,
S. D. New York.

July 20, 1976.

Company, Inc. and Fawcett Publications, Inc.

## OPINION

GAGLIARDI, District Judge.

This is a copyright infringement and invasion of privacy suit by Robert and Michael Meeropol against Louis Nizer ("Nizer"), author of the book *The Implosion Conspiracy,* Doubleday & Company, Inc. ("Doubleday"), the book's hardcover publisher, and Fawcett Publications, Inc. ("Fawcett"), the paperback publisher. The complaint alleges that *The Implosion Conspiracy,* which is about the espionage trial and conviction of Julius and Ethel Rosenberg, the plaintiffs' natural parents, invades the plaintiffs' privacy and infringes on common law and statutory copyrights they hold on letters their parents wrote while in jail awaiting execution.

Three opinions have already been rendered in this case by former Judge Harold R. Tyler, Jr.: the first denied a preliminary injunction on the copyright claim on the ground that the plaintiffs had not shown a substantial likelihood of success, 361 F.Supp. 1063 (S.D.N.Y.1973);[1] the second, which was subsequently affirmed by the Court of Appeals, stayed a similar action brought by plaintiffs in Connecticut against Fawcett on condition that Fawcett intervene in this action, 73 Civ. 2720 (April 3, 1974) (unreported) *aff'd* 505 F.2d 232 (2d Cir. 1974); the third dismissed on the merits without leave to replead plaintiffs' invasion of privacy and defamation claim. 381 F.Supp. 29 (S.D.N.Y.1974). Plaintiffs have served a supplemental complaint including the same invasion of privacy claim in slightly different language. Defendants now move for summary judgment dismissing plaintiffs' complaint in its entirety.

While complete familiarity with all Judge Tyler's opinions is necessary for a full understanding of the issues here involved, the following extracts from the first opinion set forth the basic facts:

Marshall Perlin, New York City, for plaintiffs.

Philips, Nizer, Benjamin, Krim & Ballon, New York City, by George Berger, Martin Stein, New York City, for defendant Nizer.

Satterlee & Stephens, New York City, by Robert M. Callagy, James F. Rittinger, New York City, for defendants Doubleday &

---

1. An appeal was apparently taken from the denial of the preliminary injunction, but was later withdrawn. *See* 505 F.2d 232, 237 (2d Cir. 1974).

Plaintiffs are the natural children of Julius and Ethel Rosenberg, who were executed in June, 1953 after their trial for treason in this court. Their complaint, filed on or about the same day as the present motion, sets out three separate claims: (1) for statutory copyright infringement pursuant to 17 U.S.C. § 101, with a prayer for permanent injunctive relief; (2) for damages of $1,000,000 for malicious defamation and invasion of plaintiffs' privacy through the publication of *The Implosion Conspiracy*; and (3) for money damages of $1,000,000 for common law infringement of and for injury to plaintiffs' property rights in unpublished and uncopyrighted works of their parents. Alleging diversity of citizenship, plaintiffs assert that this court has jurisdiction of the second and third claims pursuant to the provisions of 28 U.S.C. § 1331 . . . In essence, it is charged that Nizer in his book quoted all or portions of some 29 letters of Ethel and Julius Rosenberg, which appeared in the book Death House Letters of Ethel and Julius Rosenberg, copyrighted in the United States in 1953 by the Jero Publishing Company, Inc. ("Jero").[2]

\* \* \* \* \* \*

Nizer and Doubleday contend, *inter alia,* that the challenged quotations constitute fair use of the material, that a significant part of the allegedly infringed material, if not all of it, is already in the public domain, that the plaintiffs are not the true copyright owners as asserted, and that they are barred by laches from bringing this action.

\* \* \* \* \* \*

*The Implosion Conspiracy* has enjoyed considerable popular success since its publication in February [1973]. In essence, it purports to be a factual but readable account of the trial and post-conviction legal proceedings in the celebrated *Rosenberg* case. A subordinate but nevertheless important theme of the author, as I understand his work, centers upon legal

efforts of Emanuel Bloch and his total professional and emotional dedication to his clients, Julius and Ethel Rosenberg. Although the plaintiffs apparently claim otherwise, my reading of the book indicates that by and large it is a sympathetic and sensitive account of the Rosenbergs' personal, political and legal problems during the years of the trial and post-conviction appeals.

The parties agree that *Death House Letters* has been out of publication for almost twenty years.

\* \* \* \* \* \*

. . . for the purposes of this motion, plaintiffs, in my view, have made a sufficient offer of proof that they are the equitable, if not legal, owners of the statutory claim. . . .

Nonetheless, upon evaluation of the entire record before the court, I conclude that the plaintiffs cannot meet their burden of establishing likelihood of success in this case. . . .

A major reason for concluding that the plaintiffs have fallen short of showing likelihood of success is the fair use defense raised by the defendants. . . .

\* \* \* \* \* \*

. . . the continuing interest in and importance of the celebrated *Rosenberg* case probably entitles the defendants' new book to invocation of the fair use doctrine. . . .

Plainly, as defendants concede, *The Implosion Conspiracy* was designed and has been sold as a trade book for commercial gain . . . The book's commercial success, however, is no reason to conclude that it should be denied the benefits of the fair use doctrine. As I read *The Implosion Conspiracy,* the quotations were used with discretion and with demonstrable purpose to illustrate, from an historical and legal point of view, the post-conviction appeals and petitions for clemency which were filed by and for Mr. and Mrs. Rosenberg. The relevant por-

---

**2.** The parties now agree that only 28 letters are covered by plaintiffs' statutory copyright effec- tive in the United States. Two additional letters were copyrighted in the English edition.

tions of the book almost certainly will provide reasonably valuable source material for future historians, biographers and social scientists. Indeed, the conceded fact that the letters have been out of publication here and abroad for almost twenty years, in my view, tends to enhance the likelihood that defendants can prove fair use of the letters in question. Thus defendants are likely to prove that their book is a serious, full and readable account of what was a trial of great historical interest; that resort to quotations of certain of the Rosenbergs' letters is important to any serious book on their trial; and that there is little possibility of injury to the plaintiffs. Indeed, defendants may be able to show that their book has enhanced the value of plaintiffs' copyright. . . .

\* \* \* \* \* \*

In their papers opposing plaintiffs' motion, defendants have suggested and indeed urged that the record is sufficient for this court to dismiss the first claim on this ground. But "fair use" would seem to be a function of all of the circumstances, and plaintiffs should have the opportunity to rebut the presumption that arises from the nature of the materials and the circumstances described herein. It is not altogether clear that letters stand on the same footing as "historical facts", which are the product of research and in turn form the basis for subsequent works. See *Rosemont* [*v. Random House,* 366 F.2d 303 (2 Cir. 1966)], *supra.* And the relatively slight quantitative significance of the quotations perhaps overstates their qualitative impact. Defendant Nizer, moreover, is a lawyer; he knew about Death House Letters and its copyright, yet made only one somewhat ambiguous attempt to obtain permission to cite the letters in his book. Finally, although this is not stressed by the parties, it appears that defendant Doubleday published another book, *Invitation to an Inquest.* In the original version of that book, excerpts of certain of the Rosenberg letters appeared; but there is evidence that Doubleday would not permit such use unless written consent was obtained. Thus, it would seem that both defendants were well aware of the potential copyright infringement represented by quotations of the letters in *The Implosion Conspiracy.* Accordingly, defendants' motion to dismiss the first claim is denied without prejudice.

To summarize, then, the plaintiffs' motion for temporary injunctive relief is denied in all respects; further, the defendants' cross motion to dismiss the first stated claim in the complaint is denied without prejudice to renewal thereof upon an expanded record. 361 F.Supp. at 1065, 1067–68, 1070.

The defendants now renew their motion for dismissal of the complaint on the basis of an "expanded record."

## I. Invasion of Privacy and Defamation Claim

Before discussing the other issues raised by the present motion it is well to dispose of the restated invasion of privacy and defamation claim. As this claim was previously dismissed without leave to replead by Judge Tyler, it is not properly before this court at this time. The supplemental complaint merely repleads and embellishes the allegations of the original complaint with respect to this claim in slightly more colorful language. Any new allegations in the supplemental complaint were previously considered and rejected by Judge Tyler at the time of the original dismissal of the claim. Count II of plaintiffs' supplemental complaint must thus again be dismissed on the ground of law of the case.

## II. Copyright Claims

The defendants have expanded the record by providing (1) financial statements of Jero Publishing Co. and the Rosenberg Children's Trust Fund, showing no income from the Death House Letters after 1957 and (2) examples of 16 biographical and historical works containing excerpts of letters used to illustrate and explain historical events. Plaintiffs have expanded the record with (1) affidavits of college history professors

and authors of other books about the Rosenberg trial stating that The Implosion Conspiracy is of no historical value, and (2) Nizer's marked copies of those other works about the trial which allegedly indicate the extent of Nizer's reliance on those authors' research.

For the purposes of this motion, the defendants concede copying certain portions of letters covered by plaintiffs' copyright, but assert the right to do so under the "fair use" doctrine. In opposition, plaintiffs vigorously assert that summary judgment is inappropriate since the applicability of the fair use doctrine is a factual question which can only be determined at trial.

A. *The Fair Use Doctrine*

Defendants admit that *The Implosion Conspiracy* contained verbatim portions of some 28 letters—amounting to a total of 1957 words—which previously appeared in copyrighted editions of the *Death House Letters*.[3] They argue, however, that the amount of copying was relatively insubstantial in the context of the total work—approximately .85% of the 228,900 words in *The Implosion Conspiracy* and 2.4% of the 80,000 word *Death House Letters.* Defendants assert that given the historical nature of *The Implosion Conspiracy* and the nature and use made of the letters in that work, any copying of copyrighted material is sufficiently limited to bring it within the protection of the fair use doctrine. Although the defendants' claim raises difficult questions in a difficult area of the law, on the basis of the record before it this court agrees that the doctrine of fair use should be applied to this case.

 The concept of fair use is founded on "a privilege in others than the owner of a copyright to use the copyrighted material in a reasonable manner without his consent, notwithstanding the monopoly granted to the owner." Ball, Copyright and Literary Property 260 (1944); *Rosemont Enterprises, Inc. v. Random House, Inc.,* 366 F.2d 303 (2d Cir. 1966), *cert. denied,* 385 U.S. 1009, 87 S.Ct. 714, 17 L.Ed.2d 546 (1957). The exact scope and limits of the doctrine are not clearly defined, with each case resting on its own specific facts—a situation which has led some commentators to call the doctrine "the most troublesome in the whole area of copyright." 1 Nimmer on Copyright § 145 at 644 (1972); *Dellar v. Samuel Goldwyn, Inc.,* 104 F.2d 661, 662 (2d Cir. 1939); *See Time, Inc. v. Bernard Geis Associates,* 293 F.Supp. 130, 145 (S.D.N.Y.1968), citing, H.R. Rep. No. 83, 90th Cong., 1st Sess. 29–30 (1967) ("since the doctrine in an equitable rule of reason, no generally applicable definition is possible"). Nevertheless, the vitality of the doctrine is now well established as courts in recent years have come to recognize that there are occasionally situations in which the copyright holder's interest in a maximum financial return must occasionally be subordinated to the greater public interest in the development of art, science and industry. *Berlin v. E. C. Publications, Inc.,* 329 F.2d 541, 544 (2d Cir. 1964), *cert. denied,* 379 U.S. 822, 85 S.Ct. 46, 13 L.Ed.2d 33; *Rosemont Enterprises v. Random House, Inc., supra* at 307. Although such situations cannot be easily defined in advance, in determining whether the use of copyrighted material constitutes a "fair use" the courts generally must consider the following four factors: (1) the purpose and character of the use, (2) the nature of the copyrighted work, (3) the amount and substantiality of the material used in relation to the copyrighted work as a whole, and (4) the effect of the use upon the copyright owner's potential market for and value of his work. *Williams and Wilkins Company v. United States,* 487 F.2d 1345, 1352, 203 Ct.Cl. 74 (1973), *aff'd, per curiam* 420 U.S. 376, 95 S.Ct. 1344, 43 L.Ed.2d 264 (1975);

---

**3.** The plaintiffs now agree that only 1,957 words are subject to the American copyright. They note, however, that there are two additional letters from which the plaintiffs have copied approximately 1,058 words that are copyrighted in the British edition of the *Death House Letters.* While plaintiffs concede that the copying of these letters may not have constituted a copyright infringement, they contend that the use of those letters, along with the copyrighted material serves to illustrate both the quality and quantity of the unlawful taking and use.

*Time, Inc. v. Bernard Geis Associates, supra* at 145. In evaluating these factors, an extremely important consideration is the public interest served by the use of the copied materials and by the copying work itself. In *Rosemont Enterprises, Inc. v. Random House, supra,* the leading Second Circuit case on fair use, the Court thus stated:

> . . . whether the privilege may justifiably be applied to particular materials turns initially on the nature of those materials, e. g., whether their distribution would serve the public interest in the free dissemination of information and whether their preparation requires some use of prior materials dealing with the same subject matter. Consequently the privilege has been applied to works in the fields of science, law, medicine, history and biography. 366 F.2d at 307

In this case plaintiffs claim summary judgment should not be granted because substantial issues of fact exist as to (1) whether the defendants' book is a historical work entitled to the protection of the fair use doctrine, (2) the quantitative and qualitative significance of the copied material to the defendants' work, and (3) the effect of defendants' use of the copied materials on the market for the copyrighted work.

### B. *Summary Judgment*

In their original papers, plaintiffs placed primary reliance on *Arnstein v. Porter,* 154 F.2d 464 (2d Cir. 1956), a copyright case in which Judge Frank found summary judgment to be inappropriate despite an almost overwhelming showing that there was absolutely no substance to the plaintiff's claim. In the period since this motion was submitted, the Second Circuit has come down with a series of decisions outlining the standards to be applied in motions for summary judgment. *Heyman v. Commerce and Industry Insurance Co.,* 524 F.2d 1317 (2d Cir. 1975); *Judge v. City of Buffalo,* 524 F.2d 1321 (2d Cir. 1975); *Jaroslawicz v. Seedman,* 528 F.2d 727 (2d Cir. 1975); *Zolar Publishing Company, Inc. v. Doubleday & Company, Inc.,* 529 F.2d 663 (2d Cir. 1975);

*Home Insurance Co. v. Aetna Casualty and Surety Co.,* 528 F.2d 1388 (2d Cir. 1976); *United States v. Bosurgi,* 530 F.2d 1105 (2d Cir. 1976); *Chanofsky v. Chase Manhattan Corp.,* 530 F.2d 470 (2d Cir. 1976); *United States v. Matheson,* 532 F.2d 809 (2d Cir. 1976); *Williams v. McAllister Brothers, Inc.,* 534 F.2d 19 (2d Cir. 1976). In *Heyman v. Commerce and Industry Insurance Co.,* the earliest of these recent cases, the Court questioned the continuing validity of *Arnstein v. Porter* stating:

> Although for a period of time this Circuit was reluctant to approve summary judgment in any but the most extraordinary circumstances, *see, e. g., Arnstein v. Porter,* 154 F.2d 464, 468 (2d Cir. 1946), that trend has long since been jettisoned in favor of an approach more in keeping with the spirit of Rule 56. 524 F.2d at 1319.

The Court, however, went on to say:

> But, the "fundamental maxim" remains that on a motion for summary judgment the court cannot try issues of fact; it can only determine whether there are issues to be tried. *American Manuf. Mutual Ins. Co. v. American Broadcasting-Paramount Theatres, Inc.,* 388 F.2d 272, 279 (2d Cir. 1967); *Cali v. Eastern Airlines, Inc.,* 442 F.2d 65, 71 (2d Cir. 1971). Moreover, when the court considers a motion for summary judgment, it must resolve all ambiguities and draw all reasonable inferences in favor of the party against whom summary judgment is sought, *United States v. Diebold,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962), with the burden on the moving party to demonstrate the absence of any material factual issue genuinely in dispute . . . 524 F.2d at 1320.

These principles have been reaffirmed in other subsequent recent Second Circuit cases dealing with this issue. *Jaroslawicz v. Seedman, supra* at 731; *Zolar Publishing Co., Inc. v. Doubleday & Company, Inc., supra* at 666; *Chanofsky v. Chase Manhattan Corp., supra* at 472–73; *United States v. Bosurgi, supra* at 1110; *United States v. Matheson, supra* at 815; *Williams v. McAl-*

*lister Brothers, Inc., supra* at 20. At least two of these cases, however, have upheld a grant of summary judgment where it was clear that there was no genuine factual dispute relevant to the issue for decision. In *United States v. Matheson,* for example, where the issue was the citizenship for tax purposes of a wealthy decedent, the Court found that summary judgment was proper despite the contention that there was a factual question as to whether the decedent had renounced her American citizenship. The Court reviewed with approval the holding in *Heyman* and then stated:

> Only if no material factual issues exist may summary judgment be granted. However, it is equally true that summary judgment should not be denied where the only issues raised are frivolous and immaterial ones which would simply serve to provide an exercise in futility or a purposeless trial for the district court, particularly where no jury has been demanded. *See Beal v. Lindsay,* 468 F.2d 287, 292 (2d Cir. 1972); *Houghton Mifflin Co. v. Stackpole Sons, Inc.,* 113 F.2d 627, 628 (2d Cir.) *cert. denied* 308 U.S. 597, 60 S.Ct. 131, 84 L.Ed. 499 (1940).

This principle was also applied in a seaman's personal injury action in *Williams v. McAllister Brothers, Inc., supra* at 20.

These recent cases indicate that to succeed on this motion defendants must show that there are no genuine issues of fact to be tried. However, the mere fact that a determination of the fair use question requires an examination of the specific facts of each case does not necessarily mean that in each case involving fair use there are factual issues *to be tried.* Undoubtedly, in many cases there are disputed factual questions crucial to the resolution of the fair use issue which can only be resolved at trial. In such cases, courts have properly denied summary judgment. *Higgins v. Baker,* 309 F.Supp. 635 (S.D.N.Y.1970); *Consumers Union of United States, Inc. v. Hobart Mfg. Co.,* 199 F.Supp. 860, 861 (S.D.N.Y.1961); *Cf. MacDonald v. DuMaurier,* 144 F.2d 696, 701 (2d Cir. 1944). On the other hand, in other cases involving the fair use doctrine where the facts were not seriously in dis-

pute or the disputed facts would not affect the decision even if found adversely to the moving party, summary judgment has been granted. *Berlin v. E. C. Publications, Inc., supra*; *Gardner v. Nizer,* 391 F.Supp. 940 (S.D.N.Y.1975); *Time, Inc. v. Bernard Geis Associates, supra*; *Karll v. Curtis Publishing Co.,* 39 F.Supp. 836 (E.D.Wis.1941); *Broadway Music v. F–R Publishing Corporation,* 31 F.Supp. 817 (S.D.N.Y.1940). In such cases, a full trial by the district court would be a purposeless exercise in futility. *United States v. Matheson, supra*; *Williams v. McAllister Brothers, Inc., supra.*

■ Plaintiffs here argue that there are significant factual issues for trial, but a careful examination of the record before this court indicates a skillful attempt by plaintiffs to manufacture factual issues for trial where in reality none exist. The issues as to which plaintiffs claim there are factual questions in this case are either not in dispute or are such that even if resolved in plaintiffs' favor the ultimate decision on the fair use question would not be affected.

Plaintiffs submit 14 affidavits from professors of history at leading universities and writers of other books about the Rosenberg trial stating in essence that *The Implosion Conspiracy* is riddled with distortions and inaccuracies and thus has no historical value. Through the testimony of these purported experts, plaintiffs claim that at trial they will be able to show that the defendants' book is not a historical work and thus is not entitled to the protection of the fair use doctrine. While plaintiffs' voluminous and vehement submission on this point gives the distinct impression that what is really desired is a trial of the accuracy and fairness of defendants' book and its implicit conclusion that the controversial Rosenberg trial was fair—an issue on which history alone must provide the final judgment—plaintiffs apparently do not fully understand the minimal standard which must be met in order for a work to be entitled to fair use protection. Even assuming plaintiffs' experts are correct that defendants' work is grossly inaccurate and distorted and lacking in even the minimum

indicia of serious, scholarly historical research, it is not precluded from invoking the protection of the fair use doctrine. *Rosemont Enterprises, Inc. v. Random House, supra* indicates that the definition of a scientific or historical work for purposes of the fair use doctrine is a very broad one. In *Rosemont*, the Court of Appeals reversed the district court's holding that the fair use privilege applies only to scholarly works written for scholarly audiences and found that a commercial biography of Howard Hughes was entitled to fair use protection. The Court there stated:

> . . . Indeed while the Hughes biography may not be a profound work, it may well provide valuable source material for future biographers (if any) of Hughes or for historians or social scientists. Contrary to the district court's view, the arts and sciences should be defined in their broadest terms . . . particularly in view of the development of the field of social sciences. . . .
>
> \* \* \* \* \* \*
>
> . . . Thus we conclude that whether an author or publisher has a commercial motive or writes in a popular style is irrelevant to a determination of whether a particular use of copyrighted material in a· work which offers some benefit to the public constitutes a fair use. 366 F.2d at 307.

In order to be a "historical" work for the purposes of invoking the fair use doctrine, defendants' book thus need not evidence (even a minimum) scholarly effort or be in the form prescribed by academic historians, as plaintiffs' experts apparently believe. Rather all that need be shown is that there be some serious attempt to describe a historical event which could be of some benefit to the public at large. Whether the work here meets this minimal legal standard is a question of law which must be determined by the court primarily on the basis of an examination of the work itself.

As previously noted, by Judge Tyler, *The Implosion Conspiracy* is primarily an analysis of the Rosenberg trial and the post-conviction legal proceedings.[4] The author of the book—Louis Nizer—has a reputation as a leading trial lawyer. Even if, as plaintiffs contend, the book is filled with errors and completely devoid of independent research, this court believes that, as a matter of law, a purportedly serious work by one with Nizer's reputation and experience as a trial lawyer about a famous and controversial trial is of some public benefit and thus a historical work entitled to claim the protection of the fair use doctrine. The affidavits by the plaintiffs in no way raise a genuine issue of fact as to this question; rather, they indicate either a misunderstanding of the legal definition of a historical work for purposes of the fair use doctrine or that there may be disputed factual questions as to issues irrelevant to the determination of whether the defendants' book falls within that definition. The affidavits of many of plaintiffs' experts indicate that in fact even they would concede that defendants' book meets this minimal legal standard.[5]

Plaintiffs also claim that they will be able to prove at trial that defendants' work has reduced the potential market for future publications of the Rosenberg letters and that the amount of material copied by the defendants is quantitatively and qualitatively substantial. While plaintiffs have yet to come forward with one iota of evidence indicating that *The Implosion Con-*

---

**4.** 361 F.Supp. at 1065.

**5.** The affidavit of Professor Chomsky for example concedes that there are some comments on legal strategy of the parties and errors in cross examination in Nizer's book that might be of value. The letter of Professor Genovese states that the book has some value "as a document in itself." The letter of Mr. Goldstein, the producer of a television program about the Rosenberg trial, states that the book was read "with interest particularly inasmuch as Nizer is a close associate of Kaufman and Saypol." The affidavit of Professor Falk indicates that Nizer's book, is a work of entertainment, which a library collecting books for scholars might buy "for the sake of completeness." The affidavit of Professor Williams indicates that the work would have value as primary source material for a scholar undertaking a biographical study of the author.

*spiracy* has in any way damaged the market for the Rosenberg letters,[6] it is possible that plaintiffs at trial would be able to prove such damage. For purposes of this motion, therefore it must be assumed that the defendants' book diminished the value of plaintiffs' copyrighted letters. This fact alone, however, is not in this court's view sufficient to preclude the defendants from claiming fair use. While the impairment of the commercial value of the copyrighted work is a factor to be considered, a copy may be sufficiently limited or otherwise privileged so as to be entitled to fair use protection.

Plaintiffs' claim that there are disputed factual issues as to whether the amount of copying in defendants' work is qualitatively and quantitatively substantial raises more difficult questions, as this claim goes to the heart of the fair use defense. Undoubtedly, whether a given amount of copied material is "substantial" is in some sense a factual question; it is not, however, necessarily an issue as to which there are factual questions to be tried. Accepting plaintiffs' claim as to the amount of material copied as true, as must be done on the present motion, what is in dispute is not the extent of copying but rather the legal conclusion to be drawn from the admitted amount of copying. With both works before the court and the amount of copying undisputed, the question arises whether under the circumstances here there is any evidence that could be presented at trial which might ultimately affect the determination as to the qualitative or quantitative importance of the copying.

■ Plaintiffs argue that this determination cannot be made solely from a reading of the two works. In papers filed at the court's request after supplemental argument, plaintiffs claim they will adduce at trial evidence extrinsic to the infringing and copyrighted works showing the importance of the copyrighted materials. However, most of the evidence which plaintiffs

say they will introduce at trial relates to issues that for purposes of this motion are either not in dispute or not relevant to the fair use question. Recognition of the literary quality of the Rosenberg letters, for example, is not really disputed; as noted above in this case the historical accuracy of defendants' book or the amount of independent research that went into its preparation is not relevant. The other evidence which plaintiffs indicate they would introduce at trial even if unchallenged would not in this court's view affect the decision on the fair use question. The fact that the defendants may have used copied materials in the promotion of their work does not in itself prove that the copied materials are important to the work itself. Similarly, the alleged standard rule in the publishing industry in the United States that use of more than 300 words of a copyrighted work does not qualify as a fair use, even if such a rule exists, is not dispositive of the fair use question. Fair use is a legal question to be determined by the court not by alleged industry practice.

■ Plaintiffs also imply that they can present expert testimony presumably by literary authorities that would establish the quantitative and qualitative importance of the letters to the copyrighted and infringing works. Under Rule 702 of the Federal Rules of Evidence such expert testimony is permissible if it "will assist the trier of fact to understand the evidence or to determine a fact in issue." The admission or exclusion of such testimony is a matter within the sound discretion of the trial court. *Salem v. United States Lines, Co.,* 370 U.S. 31, 35, 82 S.Ct. 1119, 8 L.Ed.2d 313 (1962); *Capri Jewelry Incorporated and Tancer & Two, Inc. v. Hattie Carnegie Jewelry Enterprises, Ltd. and James,* 539 F.2d 846, 849 (2d Cir. 1976); *Keystone Plastics, Inc. v. C&P Plastics, Inc.,* 506 F.2d 960, 966 (5th Cir. 1975); *see also Butkowski v. General Motors Corp.,* 497 F.2d 1158, 1159 (2d Cir. 1974); *Steven-*

6. In fact, as Judge Tyler pointed out, if anything the record before this court indicates that the publication of *The Implosion Conspiracy* may have enhanced the value of plaintiffs' copyright on their parents' letters.

*son v. United States,* 378 F.2d 354 (2d Cir. 1967).

■ Although there may be fair use cases in which, because of the technical nature of the materials or other factors, such testimony is useful, this court does not believe that expert testimony on the qualitative impact of the Rosenberg letters in *The Implosion Conspiracy* would assist the trier of fact in determining the fair use question, and therefore it would not admit such testimony at trial. The work to be evaluated in this case dealt with a famous and controversial trial held in this district approximately 25 years ago. This court, or a jury, is fully competent to understand the subject matter of the work and to evaluate the qualitative importance of certain materials to the presentation of that subject. In a case like this the importance of the copied materials must be determined primarily by an examination of the copyrighted and infringing works themselves. There is thus no factual question to be tried with respect to this issue.

That there is no question *to be tried* as to whether the amount of copying is qualitatively or quantitatively substantial does not, however, mean that there is no factual issue to be resolved as to this issue. Certainly, the qualitative impact of the copied material—i. e., its importance to the work—may present an issue as to which reasonable men can disagree, even though the basic quantity of the infringement and all the other surrounding circumstances are undisputed.[7] Under these circumstances, the ultimate resolution of the issue must turn on the subjective judgment of the trier of fact, and. thus the standards to be applied on a motion for summary judgment may well be more stringent in a case in which the issue is to be submitted to a jury than in one in which a jury has been waived. As discussed in more detail below, in this case there is the somewhat anomalous situation that the plaintiffs have waived a trial by

jury as to the defendants Nizer and Doubleday, but not as to the defendant Fawcett. The standard to be applied to the defendant Fawcett's motion for summary judgment thus may be different from that to be applied to Nizer and Doubleday's motions, even though each defendant may be entitled to summary judgment.

C. *Application of the Fair Use Doctrine to These Letters*

Turning finally to the substantive question of whether in the circumstances of this case the use of plaintiffs' copyrighted letters in defendants' book is a fair use, this court must first determine the extent of copyright protection available to letters written by historical figures about public events. On the motion before him, Judge Tyler expressed uncertainty as to whether letters stand on the same footing as "historical facts" which are the product of research and in turn form the basis for subsequent works. 361 F.Supp. at 1070. Defendants submit examples of 16 different biographical and historical works in which excerpts from letters by historical figures are used to document, support and substantiate the authors' theories and conclusions about historical events, but apparently in none of these works were the excerpted letters subject to the copyright of someone who objected to their use.

Here the plaintiffs contend that the copyrighted letters constitute their parents' individual intellectual product and that the letters have high literary value which the defendants should not be permitted to appropriate in violation of their copyright. The problem is that the Rosenbergs' letters are also part of the historical record of events relating to the trial. Only in these letters do the Rosenbergs so fully set forth their thoughts and feelings about the events of which they were a significant part. Those thoughts and feelings are historical facts relating to the trial which may

---

7. In the case of a design infringement, for example, the sole issue may be whether one pattern is sufficiently similar to another one. With a copy of both designs before the court,

the question of their similarity is a factual one as to which two different arbiters of fact could draw different conclusions. It is not, however, necessarily a factual issue *for trial.*

be directly relevant to a history of the events surrounding it.

It is not sufficient, as plaintiffs suggest, for the defendants who wished to describe the Rosenbergs' thoughts and feelings to resort to "the obvious device of not quoting them directly." To do so would have prevented them from fully and accurately conveying the Rosenbergs' own expression, which in this situation may be essential to an accurate rendition of the relevant thoughts themselves.[8] Furthermore, the Rosenbergs' expression itself may be a relevant part of the history relating to the case. The Rosenbergs' rights in their own expression thus must be balanced against the public interest of historians and others in freely disseminating information about them and their reactions to the trial.

While famous individuals have long been considered to have rights with respect to the publication of their letters, *Baker v. Libbie,* 210 Mass. 599, 606, 97 N.E.2d 109, 112 (1912); *Philip v. Pennell,* 2 Ch. 577, 590 (1907). Note, *Personal Letters: In Need of a Law of their Own,* 44 Iowa L.Rev. 705 (1959); *cf. Estate of Hemingway v. Random House, Inc.,* 53 Misc.2d 642, 279 N.Y. S.2d 51, 58 (Sup.Ct.1967) *aff'd mem.* 29 A.D.2d 633, 285 N.Y.S.2d 568 (1st Dep't 1967), *aff'd* 23 N.Y.2d 341, 296 N.Y.S.2d 771, 777, 244 N.E.2d 250 (1968), the question of whether limited parts of those letters can be copied verbatim in a historical work dealing with an event in which the writer was a major participant has rarely arisen. *Folsom v. Marsh,* 9 Fed.Cas. 342, Fed.Cas. No. 4,901 (1841) appears to be the only American case which discusses this issue directly. There Justice Story outlined the then recently developing doctrine of fair use. In that case it was held that copyrighted letters of George Washington could not be republished in their entirety in a work on Washington's life where 255 pages of the 866 page infringing work consisted of copyrighted material. Justice Story therefore clearly found that the letters of a

historical figure are at least to some extent entitled to copyright protection—even where the infringement is in a historical work. He also specifically rejected the defendant's claim that the limited use of the letters as part of a historical work constituted fair use—finding that "if the value of the original is sensibly diminished or the labors of the original author are substantially appropriated" there could be no fair use. It should be noted, however, that *Folsom v. Marsh,* involved a situation in which the copyrighted letters were a very substantial portion of the infringing work. Justice Story at the end of his opinion stated:

It is not a case where abbreviated or select passages are taken from particular letters; but the entire letters are taken, and those of most value to the public. . . . If it had been the case of a fair and bona fide abridgement of the work of plaintiffs, it might have been admitted of a very different consideration.

By contrast, the use of copyrighted letters by defendants here is much more limited. The copyrighted letters appear in the latter part of defendants' book in passages describing the experiences of the Rosenbergs while awaiting execution—particularly their reactions to the various legal proceedings. As Judge Tyler noted, the quotations are used "with discretion and with demonstrable purpose to illustrate from a historical point of view, the post-conviction appeals and petitions for clemency which were filed for Mr. and Mrs. Rosenberg." 361 F.Supp. at 1068. The defendants' book seeks to describe the trial and its effects on the major participants. The letters are used by the defendants to illustrate and describe the impact of the trial on the Rosenbergs in the period after their conviction, as well as to convey their thoughts and feelings about the post-conviction legal proceedings. While not substantial in the context of the total work, the amount of copyrighted material used is more than insignif-

---

8. This problem is discussed in Nimmer on Copyright § 9.232 at 28.21–28, 32 where the earlier decision by Judge Tyler is described as

"a difficult border-line case testing the principle. . . ." § 9 at 28.30 n. 208b (1975 Supp.).

icant. However, the letters do not in any sense form a major part of defendants' work.[9]

Under these circumstances, the character and purpose of the use and the nature of the defendants' work are the primary factors that must be considered in determining whether the Rosenbergs' property interest in the letters should be subordinated to the public interest in their dissemination by the defendants. This court believes that the relevant test for a fair use of historical letters should be (1) whether the taking is limited in scope, and (2) whether in the context of the entire work it appears that the purpose of using the letters is to illustrate historical facts with which the work deals rather than to capitalize on the unique intellectual product of the person who wrote them.

The application of this test to this case is complicated by the fact that a jury trial has been waived as to the defendants Nizer and Doubleday, but not as to Fawcett. Fawcett contends that since the defense of fair use is an equitable defense, plaintiffs are not entitled to a jury trial on the question of fair use in any event. In this case, however, the plaintiffs are clearly seeking money damages for losses they allegedly incurred as a result of defendants' purported infringement. This is a legal claim as to which they are entitled to a trial by jury. The fact that the defendants interpose a defense which they denominate as an "equitable defense" does not deprive the plaintiffs of their right to have a jury determine the merits of their claim if the case is otherwise appropriate for submission to a jury. *See Ross v. Bernhard,* 396 U.S. 531, 538–39, 90 S.Ct. 733, 24 L.Ed.2d 729 (1970); *Dairy Queen, Inc. v. Wood,* 369 U.S. 469, 472–73, 82 S.Ct. 894, 8 L.Ed.2d 44 (1962); *Beacon Theatres, Inc. v. Westover,* 359 U.S. 500, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959).[10] Here, the Court of Appeals in its opinion affirming Judge Tyler's stay of the Connecticut action has already specifically found that plaintiffs have not waived their right to a jury trial with respect to Fawcett. 505 F.2d at 238. Therefore, if there is to be a trial in this case, with respect to Fawcett, plaintiffs are entitled to have all issues appropriate for determination by the trier of fact determined by a jury.

However, even where there is a right to a trial by jury, the applicability of the fair use doctrine may not be a jury question. The fair use defense generally raises a mixed question of law and fact. In the first instance, the court must determine whether, as a matter of law, the use of copyrighted material in a specific case is entitled to fair use protection. Where the facts and inferences point so strongly and overwhelmingly in favor of one party that the court believes that reasonable men could only reach one conclusion, it may render judgment as a matter of law in that party's favor without ever permitting the case to go to the jury. *See Brady v. Southern Railway Co.,* 320 U.S. 476, 479–80, 64 S.Ct. 232, 88 L.Ed. 239 (1943); *Fitzgibbons v. United States,* 522 F.2d 1353, 1354 (5th Cir. 1975); *Bertot v. School District No. 1, Albany County, Wyoming,* 522 F.2d 1171, 1175–76 (10th Cir. 1975); *Boeing Company*

9. In *Folsom v. Marsh,* the court stated:
 ". . . everyone must see, that the work of the defendants is mainly founded upon these letters, constituting more than one third of their work, and imparting to it its greatest, nay, its essential value. Without those letters, in its present form the work must fall to the ground." 9 Fed.Cas. at 349.

10. The cases cited by defendant in support of its contention that there is no such right to a trial by jury in this case either involved claims as to which money damages were not sought as in *Cayman Music Ltd. v. Reichenberger,* 403 F.Supp. 794 (W.D.Wis.1975) and *Berlin v. Club* 100, 12 F.R.D. 129 (D.Mass.1951), or like *Liberty Oil Company v. Condon National Bank, et al.,* 260 U.S. 235, 43 S.Ct. 118, 67 L.Ed. 232 (1922) are cases that were decided prior to the Supreme Court's decisions in *Beacon Theatres, Inc. v. Westover, supra, Dairy Queen, Inc. v. Wood, supra,* and *Ross v. Bernhard, supra* upholding the right to a trial by jury in cases in which there are both legal and equitable claims. The validity of these cases today is thus questionable. See, *e. g., Hyde Properties v. McCoy,* 507 F.2d 301, 305 (6th Cir. 1974); *Jefferson Standard Insurance Company v. Craven,* 365 F.Supp. 861, 863 (M.D.Pa.1973).

v. *Shipman,* 411 F.2d 365, 374–75 (5th Cir. 1969).

On the other hand there are many cases in which—either because the relevant facts are in dispute or because the question is sufficiently close as to turn of necessity on the subjective judgment of the specific trier of fact—it will be impossible for the court to find that there is fair use as a matter of law. In such cases the fair use question is necessarily a question of fact which must be decided by the trier of fact. It is in this latter kind of case that the right to a trial by jury becomes highly significant; for in such cases, a jury, properly instructed on the law, could very well render a valid verdict different from that which might be rendered by the trial judge on the basis of the same evidence.

In this case, in accordance with the test of fair use set forth above, the scope of the use of copyrighted material by the defendants is relatively limited, and the purpose of the use of the letters does not appear to be to capitalize on the unique intellectual product of the authors. Here, whatever their literary quality, the letters are clearly used by the defendants to describe the feelings and thoughts of two of the major participants in the Rosenberg trial. Unlike the material used in *Folsom v. Marsh,* it cannot be said that defendants' work derives a significant part of its value from the use of the copyrighted letters. Defendants' work deals largely with the trial and legal proceedings following the trial prior to the Rosenbergs' execution.

While the impact of the trial and conviction on the relationship between Julius and Ethel Rosenberg is undoubtedly a minor theme in the book, the limited use of the letters in the latter sections is not, in this court's view, quantitatively or qualitatively substantial in the context of the entire work. Nor is the copied material qualitatively or quantitatively substantial in the context of the copyrighted work. Undoubtedly, the qualitative impact of copyrighted passages is a matter that to some extent turns on individual subjective judgment. Nevertheless, the undisputed facts in the record in this case are so overwhelming that this court finds that a reasonable jury could not reach the conclusion that the copying here is not entitled to fair use protection.

Rather than being used to exploit individual feelings or expressions of plaintiffs' parents, the excerpts from the letters, like the trial transcript and other source materials, are used to relate certain facts relative to the whole event. These letters in themselves are part of the historical record. Nizer could reasonably have believed that the only way in which he could effectively present the facts relating to the Rosenbergs' reactions to the trial was to quote verbatim from limited portions of the Rosenberg letters. Nizer thus had to rely in small part on works covered by plaintiffs' copyright to present most effectively the facts relevant to his book. Given the public interest in the trial and the events surrounding it, plaintiffs' copyright should not give them a monopoly on the use or dissemination of facts relating to this historical event.[11] This court thus believes

11. There is also another related factor which should here be mentioned. Information about public figures and their reactions to the events of which they were a part is essential to the full and free discussion of those events by subsequent historians or anyone else who has an interest in them. To the degree that a public figure is the subject of historical research or attention, his family may have an interest in seeing him portrayed only in the most favorable light. In this kind of situation there is thus an inherent danger that members of the family of a historical figure may use a copyright on his writings as a means of suppressing unfavorable information or comment about him by later writers rather than for the legitimate protection of their proprietary interest in his intellectual product. Concern about this kind of misuse of the copyright laws was expressed by the concurring judges in *Rosemont Enterprises, Inc. v. Random House, Inc., supra,* who noted:

". . . it has never been the purpose of the copyright laws to restrict the dissemination of information about persons in the public eye even though those concerned may not welcome the resulting publicity. 366 F.2d at 311.

While not an important factor in the decision here, the potential for misuse of the copyright laws with respect to letters of historical figures is an additional reason for construing the fair use doctrine liberally in cases like this one.

the fair use doctrine protects defendants' right to use plaintiffs' copyrighted letters to the limited extent here, even if that use results in a diminution of the value of the plaintiffs' copyright.[12]

For these reasons, this court holds that, as a matter of law, the use of this copyrighted material under the circumstances here is covered by the fair use doctrine, and thus summary judgment is appropriate as to all defendants. Furthermore, insofar as the defendants Nizer and Doubleday are concerned, as the trier of fact, this court finds on the basis of its examination of the two books and all other facts in the record that as a matter of fact the use of the copyrighted Rosenberg letters in *The Implosion Conspiracy* constitutes a fair use. Thus, even if this court were in error in holding that the copying here is entitled to fair use protection as a matter of law, it would grant summary judgment in favor of the defendants Nizer and Doubleday on the basis of the undisputed facts.

Defendants' motion for summary judgment dismissing the complaint is thus granted.

So Ordered.

---

**12.** This court does not believe that under the circumstances here defendants' knowledge of the potential copyright infringement affects their right to claim fair use with respect to the copying of the copyrighted material. If, as has been here determined, defendants' use of the published material was legally permissible under the doctrine of fair use, then there was no necessity for them to attempt to obtain permission from the holder of the copyright. Their knowledge that the plaintiffs might contest their claim of fair use should not affect the legal validity of that claim. In *Time, Inc. v. Bernard Geis Associates, supra* the defendants had actually attempted to obtain permission to use copyrighted material and it was specifically denied. Nevertheless, the court found the use to be a fair one citing the public interest in disseminating the copyrighted material. The copyright there was on frames from the Zapruder films of the Kennedy assassination—material which was clearly more substantial in the context of the infringing work than that taken here.