Mitchell D. Schweitzer, J.
This is an action by the estate of Ernest Hemingway, and by Mary Hemingway, his widow and executrix, against Random House, Inc., and A. E. Hotchner, publisher and author, respectively, of the book “ Papa Hemingway”. The book is subtitled “a personal memoir ”, and may be properly assessed as a serious and revealing biographical portrait of the world-renowned writer by the younger author who enjoyed Hemingway’s friendship. The book deals, except for occasional “ flashbacks ”, only with the period of that friendship, 1948-1961, which were the last 13 years of Hemingway’s life.
In the main, the book is a narration of the meetings, adventures and conversations shared by Hemingway and Hotchner during this period. As was noted in an earlier stage of this litigation, there is a “ liberal use of a conversational format wherein Hemingway is quoted extensively but always within the confines of conversations to which Hotchner was also a party.” (Estate of Hemingway v. Random House, 49 Misc 2d 726, 727, affd. without opn. 25 A D 2d 719 [1st Dept., 1966].) Other portions of the work are in narrative form, and some of these contain quotations from Hemingway’s books, other published works and similar sources.
Plaintiffs have brought suit for an injunction and for damages, on several theories. One cause of action has previously been dismissed (N. Y. L. J., July 22, 1966, p. 7, cols. 5, 6 [Murphy, J.]). First, they allege that the defendants have appropriated various items which were the literary property of Ernest Hemingway and are now the property of his estate, thus infringing upon plaintiffs’ common-law copyright therein. Second, upon the same factual allegations, they claim that publication of the defendants’ book amounts to unfair competition with other works of Hemingway. Lastly, they assert that reference to Mary Hemingway in the book is a violation of her statutory right of privacy.
*464 Defendants have moved for summary judgment as to the cause of action in common-law copyright and unfair competition. For the reasons hereafter set forth, the court concludes that there is no issue of fact requiring a trial of these claims, that defendants are entitled to judgment as a matter of law, and the motion for summary judgment should be granted.
COMMON-LAW COPYRIGHT
Common-law copyright is that right which an author has in his unpublished literary creations — a kind of property right —whose extent is to give him control over the first publication of his work, or to prevent its publication. It is often referred to in short as “ the right of first publication ”. (Chamberlain v. Feldman, 300 N. Y. 135 [1949]; Pushman v. New York Graphic Soc., 287 N. Y. 302 [1942].) The right continues to exist until the work in question is generally published; and once it is so published, no further common-law copyright exists.
Plaintiffs broadly assert that some 65% of the contents of “ Papa Hemingway ” consists of “ literary matter created and expressed by Ernest Hemingway.” The broad and conclusory assertion lumps together materials of significantly different nature, as will be discussed below, and is ultimately unhelpful. Not only does it mingle unpublished and published items of several kinds, but it makes no distinction between matter contained in “Papa Hemingway” as ultimately published and matter contained in galley proofs and later deleted.
Much of the allegedly appropriated literary property upon which plaintiffs rest their claims appeared only in the aforementioned galley proofs. It is conceded that only 16 copies of these proofs were ever distributed, and that they went to several publications for review purposes only. It is also conceded that, after certain deletions were made, the proofs were recalled and replaced with proofs of the final text. This limited distribution could not have infringed on or violated any rights plaintiffs may have had in any of the contents of the original galley proofs-. Short of an attempt to obtain statutory copyright in another’s work, these rights may only be infringed by a usurpation of the right of first publication, effecting its destruction.
This, in turn, would only be effected by a general publication of the material which would cause it to fall into the public domain. (See White v. Kimmell, 193 F. 2d 744 [9th Cir., 1952].) But where “a literary work is exhibited for a particular purpose, or to a limited number of persons ”, no such publication has taken place, and any rights the author or his *465 representatives may have remain unimpaired. (Palmer v. De Witt, 47 N. Y. 532, 543 [1872]; Nimmer, Copyright, p. 225.) It has recently been held that a songwriter’s common-law copyright survived where some 2,000 copies of his song had been distributed to radio stations and musicians for “ plugging ” purposes.' In Hirshon v. United Artists Corp. (243 F. 2d 640, 645 [C.A., D.C. 1957]) Judge Bazeloit pointed out: “ Not a single copy was sold. No license or other permission was given to anyone to perform or otherwise use the song. * * * So far as appears from the record, this distribution was no more a general publication than the sending of samples to dealers for the purpose of enabling them to give orders.”
Judge Bazelon’s words could well be applied to the instant case as well. No use of any kind was made of the original galley proofs. There is no showing of any general publication of the matter deleted therefrom. These galleys are thus irrelevant to plaintiffs’ case. (See, also, Burnett v. Lambino, 204 F. Supp. 327 [U. S. Dist. Ct., S. D. N. Y., 1962]; Schellberg v. Empringham, 36 F. 2d 991 [U S. Dist. Ct., S. D. N. Y., 1929].)
Thus, plaintiffs’ rights, if any, must rest upon matter contained in the published version of “ Papa Hemingway.” Plaintiffs have, in all their papers, refrained as much as possible from specificity, and appear to hope that the court will consider all of the alleged expressions of Ernest Hemingway. However, it is manifest that a substantial number of the items depended on have no relevance to a claim resting upon common-law rights. As already pointed out, these rights cease to exist upon general publication. Plaintiffs cite, inter alia, (1) several brief quotations from works already published by Hemingway; (2) a verbatim reprint of a published magazine article by Hotchner involving an interview of Hemingway by a group of students; (3) a three-line extract, from a scatological anecdote also contained in a published long-playing record; and (4) in quite a different vein, the text of Hemingway’s statement upon acceptance of the Nobel Prize for Literature. All of these have been generally published, in that they have been distributed to the public at large, without any of the limitations that could preserve the common-law copyright.
Moreover, the materials in the first two categories have been copyrighted under the Federal statutes. Once this has been done, it is plain that any complaint concerning their appropriation can only be brought in a Federal court. Subdivision (a) of section 1338 of title 28 of the United States Code is unequivocal: ‘ ‘ The district courts shall have original jurisdiction of any civil action arising under any Act of Congress relating to patents, *466 copyrights and trademarks. Such jurisdiction shall be exclusive of the courts of the states in patent and copyright cases.” (Emphasis added.)
In addition, the Nobel Prize speech was later published, without reservation of copyright, in the Nobel Foundation’s annual volume containing the speeches of all prize winners. This volume is available in many public libraries. It is distributed in the hope of giving the widest possible circulation to these statements. This is fully in keeping with the spirit and purposes of the Nobel Prizes. It is the manifest intention that these statements should be placed in the public domain, and this intent has been accomplished. The Nobel Prize proceedings are an. occasion which has come to be viewed as belonging to the whole world. It would be contrary to sound policy to permit any private property rights to exist in a statement delivered on such' an occasion. (Cf. Public Affairs Assoc. v. Rickover, 284 F. 2d 262 [C.A.D.C., 1960], revd. on other grounds 369 U. S. 111.)
Plaintiffs also complain of Hotchner’s quotation of a press release prepared by Hemingway as to the state of his health, at a time when he was apparently besieged by the press. The statement was drafted and sent to his publisher, and concludes, “ All above is true and accurate and you can release it to anybody, including the press.” (Papa Hemingway, p. 21.)
In this instance, the text refutes plaintiffs’ claims.
Viewed as a group, the above-discussed items are trivial, both in their impact and volume. They aggregate less than 3 pages of a 304-page book. This is still a further ground for holding that they constitute no infringement. In works of this nature, authors and publishers are not prohibited from making some use of quotations from the creations of others. Before an action may be maintained, there must be a showing of a significant appropriation of plaintiffs’ property — significant both in volume and impact. In this regard, the Federal law of copyright and the State law of common-law copyright are in accord. (Smith v. Little, Brown & Co., 245 F. Supp. 451 [U. S. Dist. Ct., S. D. N. Y., 1966], affd. 360 F. 2d 928 [2d Cir., 1966]; Fendler v. Morosco, 253 N. Y. 281 [1930]; Malkin v. Dubinsky, 25 Misc 2d 460 [Sup. Ct., N. Y. County, 1960].)
Where there is a mere minor use of fragments of another’s work, especially in historical, biographical, or scholarly works, such appropriation is characterized as a “ fair, use ”, and is permitted. The justification for the privilege of fair use derives from the original rationale for copyright protection, as set forth in the Federal Constitution, (art. I, § 8); “To promote the *467 Progress of Science and the useful Arts,” including literature. (See Rosemont Enterprises v. Random House, 366 F. 2d 303 [2d Cir., 1966].) There, the court said (p. 307): “ Biographies, of course, are fundamentally personal histories and it is both reasonable and customary for biographers to refer to and utilize earlier works dealing with the subject of the work and occasionally to quote directly from such works. Cf. Harriss v. Miller, 50 U. S. P. Q. 306, 309 (S. D. N. Y. 1941). This practice is permitted because of the public benefit in encouraging the development of historical and biographical works and their public distribution ’ ’.
Hotchner’s use of the materials discussed above, even if not otherwise protected, is so clearly within the area of fair use as to leave no triable issue of fact. Particularly where one undertakes a biographical study of a famed writer, a rule which prohibited all quotation of the subject’s prior writings would render effective biography impossible. (See, also, Berlin v. E. C. Publications, 329 F. 2d 541 [2d Cir., 1964]; Note, 56 Col. L. Rev. 585, 595 [1956].)
“ Papa Hemingway” also contains some passages wherein the author has narrated material originating in letters written by Hemingway and telegrams sent by him. Specifically, plaintiffs point to three letters and two telegrams whose contents have been used. They allege no specific quotations. In an attempt to bolster this aspect of their case, they complain that they have not had adequate opportunity to compare letters in defendants’ possession or control with the manuscript. However, they are surely aware that they could have required the .production of such letters for inspection and copying, pursuant to CPLR 3120. They have not done so, and have indicated that they have completed preparation for trial by filing a note of issue and statement of readiness since this motion was argued.
Again, on this record, there has been no infringement of plaintiffs’ rights. On the existing authority, which is sparse and inconclusive, it would seem that the writer of a letter or telegram may have the right to prevent the verbatim reproduction of the document, in whole or in part. (See Matter of Ryan, 115 Misc. 472 [1921]; Baker v. Libbie, 210 Mass. 599 [1912] ; Philip v. Pennell, [1907] 2 Ch. 577.)
However, the doctrine of these cases is limited to reproduction of textual material per se, and does not extend to a use of the contents of letters not amounting to copying. The ease most closely in point here is Philip v. Pennell {supra). There, the executrix of the artist James McNeill Whistler sued to enjoin his biographers from using the texts of letters written *468 by Whistler. The case was dismissed. In dicta, the court recognized that verbatim copying would have violated plaintiffs’ rights and suggested that the authors should refrain from such copying. The importance of this case lies in its clear recognition that in the case of a prominent figure in the arts, the subject matter of his letters was a legitimate source of biographical material. This is especially so where the letters shed light on his thoughts, opinions, and methods of creativity.
It is useful to the public that such illumination be made available to the largest possible extent, and, as the court there said (p. 589): “ The legal right of prohibition may, no doubt, intervene to prevent that from being fully done; but if it can be done in part without contravening that legal right, why should the law invent a new rule to interfere with a useful result? ”
Aside from protection of privacy — a question not here germane— the literary property interest in the letters of a deceased author can adequately be protected by preventing verbatim publication. The only likely exploitation of such property would be in publication of collected letters, and such exploitation cannot be harmed by narrative use of the materials contained in the letters in a biography.
On the other hand, a man’s correspondence may be one of the very best sources of insight into his life. Assuming that the subject matter is of legitimate interest, there is no reason to hamper its use with a rule of little utility. In the present case, there has been no copying, and therefore no infringement. Moreover, most of the correspondence utilized comprised part of the continuing dialogue between Hotchner and Hemingway. Hnder the circumstances, the better rule may well be that Hotchner’s right to use the letters should be governed by the same reasoning which pertains to his right to use oral conversations.
This brings us to the nub of the case. Can Ernest Hemingway or his representatives assert any literary property right in his oral conversations with Hotchner? In denying a temporary injunction in this case, Justice Frank pointed to a number of good reasons for denying any such rights. (Estate of Hemingway v. Random House, 49 Misc 2d 726, supra.) Conversations, he said, are inevitably the product of interaction between the parties; they are not individual intellectual productions. Plaintiffs seek to escape the thrust of this argument by alleging that Hemingway’s contributions to these conversations were unique and self-sufficient, and amounted to literary compositions in themselves. To permit this contention to prevail would immerse this court, and others in future cases, in an impossible inquiry. How can anyone ever measure the rela *469 tive self-sufficiency of one party’s contributions to a dialogue? Volume is no measure, surely, as the few words of one participant may evoke the lengthier expressions of the other. Subjective inquiry into the quality of the expressions of each would be invidious and unproductive. Should we have a rule based on the relative fame or respective professions of the participants. Again, this is not the kind of measurement from which a court could fashion just results. In the instant case, both parties are writers. One is surely more famed than the other, but how can this court presume that that proves anything at all about their conversations with one another? Mr. Hotchner is a successful professional in his own right, and to deny him the use of his conversations with Hemingway on any such basis would require an assumption of omnipotence this court is not prepared to assume. Any attempt to quantify or otherwise analyze or apportion these elements demonstrates both the futility of the endeavor and the unworthiness of the idea.
While many of the conversations are related in the form of direct quotations, it is also plain that ‘1 Papa Hemingway ’ ’ is not a mere reproduction of dialogue as it actually occurred. No party contends that this is the case. Justice Frank rightly observes that much of the literary value of the book arises from its author’s selection and compilation of the conversational materials used, and with his ordering of incidents so as to form a coherent whole. This concept is also inherent in the only decided case we have discovered which turns on the copyright ability of conversations (Harris v. Miller, supra). Harris had written a book called “ Oscar Wilde His Life and Confessions,” in which he recreated various dialogues between Wilde and himself. Some 20 years later, the defendants produced a play which made liberal and verbatim use of these conversations. By way of defense, to Harris’ suit, defendants asserted that the portions of the book consisting of conversations could not be subject to copyright under the Federal statute. This contention was overruled, the court holding that plaintiff having participated in the conversations, he had contributed to an original product of a literary character, and, having set down the conversations as part of his book, he was entitled to copyright protection of the entire book, including the dialogue.
Of course, the court there did not have to deal with the question whether one party to a conversation had literary property rights as against the other, which is actually the issue in this ease. Assuming that each party to any conversation makes some contribution to it, it would seem that the only rational rule is that any party is free to publish his own version— *470 whether verbatim or not. There is no need to reach the question whether one party’s written version could ever infringe upon any other’s. It is only necessary to hold that no party may ever prevent any other from publishing the oral expressions involved.
Not only does this rule serve fairly the rights of both participants in a dialogue, it serves the public interest as well. Were anyone to have common-law copyright in his mere conversations (as opposed to prepared lectures or speeches), then the same right would have to extend to everyone. The effect on the freedom of speech and press would be revolutionary. It is a basic tradition of our society that, subject to certain limits not here pertinent, what any man says or does may be reported, quoted or written about in the interest of maintaining the freedom of access to all kinds of information which may be of legitimate interest. It is generally left to writers and publishers to determine what is of such interest. Only in rare cases does the law interfere with the freedom, and then only to protect some paramount interest, such as the national security, or the individual’s right to be free from malicious falsehood or invasion of privacy. The limitation drawn to protect such interests have generally been as narrow as the courts could make them.
Needless to say, what is important to the present must also be permitted to be preserved for the future. Were we to limit reportage to nonverbatim accounts, the only result would be to detract from accuracy and encourage nationalization. This would serve no interest, public or private, whether applied to history, or biography, or both. In fact, our law recognizes that one has a right to prevent publication of a fictionalized biography. (See Spahn v. Julian Messner, Inc., 23 A D 2d 216, affd. 18 N Y 2d 324 [1966].)
It can make no difference that, as is admitted, the author here obtained some of his materials from tape recordings he had made. That they were recorded does not change the character of the utterances. It is recognized that under some circumstances, such as where the speaker was in effect dictating to a passive receiver, he might have a claim to property in the recorded material. Too, were the recordings unlawfully made, other considerations would arise. But in this case there is no evidence other than that Hotchner used his recordings as an occasional substitute and supplement for memory or note-taking. In this respect he has done no more than take advantage of a modern technique for preserving for posterity the raw materials of history. The method has been used by others with dis *471 tinguislied results. This mouth, a National Book Award was given to the anthropologist Oscar Lewis for his book, “La Vida.” This work, dealing with “the culture of poverty ”, is based largely on, and contains extensive quotations from, recorded dialogues and interviews with the subjects. No one has suggested that the literary property in the work is theirs rather than his. Plaintiffs have called the court’s attention to another work, ‘ ‘ Felix Frankfurter Reminisces ’ ’, written by Harlan Phillips from tape recordings made with Mr. Justice Frankfurter’s co-operation. But their suggestion that the literary property was that of the speaker, rather than the writer, is not borne out. Whatever economic arrangements have been made for use of the proceeds of its sale, the book plainly bears the notation, “ Copyrighted 1965 by Harlan Phillips.” For reasons already set forth, this court concludes that this is as it should be. Historians in the past have had to reconstruct totally fictional reports of the oral events of the past, due to the paucity of accurate sources. In the light of modern scientific techniques, this need to reconstruct will diminish, and there w-ill be an increasing truthfulness and accuracy in future historical and biographical works.
It is concluded, therefore, that defendants are entitled to summary judgment as to the first cause of action.
UNFAIR COMPETITION
Recent decisions of the United States Supreme Court have made it increasingly dubious whether one whose action is basically in copyright may, if he fails to make out a case under those laws, prevail nonetheless by recharacterizing his claim as one in unfair competition. (See Sears, Roebuck & Co. v. Stiff el Co., 376 U. S. 225 [1964]; Compco Corp. v. Day-Brite Light., 376 U. S. 234 [1964].) Even prior to these decisions, New York’s State and Federal courts have refused to permit a litigant to escape the limitations of copyright protection simply by renaming his cause of action as “unfair competition.” (See, e.g., Ricordi Co. v. Haendler, 194 F. 2d 914 [2d Cir., 1952] ; Hebrew Pub. Co. v. Scharfstein, 288 N. Y. 374 [1942].)
Shortly after the Sears and Gompco decisions “ the Appellate Division for this Department limited the scope of unfair competition in this area to cases where defendants’ acts, broadly stated, were such “ as to deceive the public or defraud the plaintiff.” (Flamingo Telefilm Sales v. United Artists Corp., 22 A D 2d 778, [1st Dept., 1964].) Thus it ordered dismissal of a complaint alleging misappropriation of motion picture films which were in the public domain.
*472 That decision sets out the kinds of situations where a plaintiff might prevail in unfair competition though failing in copyright. In each of them, there is some significant element not within the purview of copyright law. Such is not the case here.
Plaintiffs’ second cause of action rests on precisely the same allegations as the first. The reasoning which denies them protection or recovery on theories of common-law copyright also operates to deny recovery on any theory of unfair competition.
The motion must be granted as to the second cause of action as well. (See, also, Cable Vision v. KUTV, Inc., 335 F. 2d 348 [9th Cir., 1964].)