Jerome D. SALINGER, a/k/a J.D. Salinger, Plaintiff,

v.

RANDOM HOUSE, INC. and Ian Hamilton, Defendants.

No. 86 Civ. 7574(PNL).

United States District Court, S.D. New York.

Nov. 5, 1986.

Kaye Collyer & Boose, New York City (R. Andrew Boose, Jeremy Nussbaum, Marcia B. Paul, M. Graham Coleman, 2d of counsel), for plaintiff.

Satterlee & Stephens, New York City (Robert M. Callagy, Mark A. Fowler, of counsel), for defendants.

LEVAL, District Judge.

J.D. Salinger, the celebrated author of *The Catcher in the Rye, Franny and Zooey, Raise High the Roof Beam, Carpenters,* and many short stories, brings this action against Ian Hamilton and Random House, Inc., who are respectively the author and publisher of an unauthorized and as-yet unpublished biography entitled *J.D. Salinger: A Writing Life.* The biography draws heavily from copyrighted letters written by Salinger many years ago. The complaint alleges copyright infringement, unfair competition, and breach of undertakings Hamilton made with libraries as a condition of access to some of the letters. Salinger moves for a preliminary injunction restraining distribution of the biography.

Hamilton is a writer, literary critic, and poet. After Random House published his well-respected *Robert Lowell: A Biography* in 1982, Hamilton set out to chronicle Salinger's life. He received advances of $100,000 from Random House and £25,000 from the British publisher William Heinemann. In July 1983, he wrote to Salinger requesting his cooperation.

Salinger for some 30 years had maintained a reclusive privacy, avoiding all publicity. He replied that he would regard any biography written during his lifetime as an invasion of privacy.

Hamilton nonetheless proceeded with his research. He had little success until his discovery of "a tremendous autobiographical resource" (Hamilton Aff. ¶ 8)—several series of letters written by Salinger years before, some of which had been lodged by the recipients (or their estates) in research libraries at Harvard, Princeton, and the University of Texas. Hamilton also found a bibliography of Salinger materials, edited by Jack Sublette and published by Garland Press, Inc. in 1984, which referred to and quoted letters deposited with Princeton's library. Salinger was unaware of the Sublette bibliography and of the deposits of his letters in the libraries.

In order to gain access to the letters at Princeton, Harvard, and the University of Texas, Hamilton signed the libraries' standard form agreements in which he undertook not to publish the documents without their permission and that of the copyright holder. The "Princeton University Library Request for Access to Manuscripts," for example, states in part:

I understand that Princeton University holds manuscripts for purposes of research and scholarship. I agree not to copy, reproduce, circulate or publish them without the permission of Princeton University Library and of the owner of

the literary property rights, if any. I assume all responsibility for any infringement by me of the literary property rights held by others in the material requested.

Hamilton submitted his manuscript in September 1985. It contained very substantial quotation from approximately 70 of the letters. In May 1986, galleys were sent to book reviewers, as well as to potential licensees in the publishing industry, and some advance reviews appeared.

Salinger somehow received a copy of the May Galleys. Then realizing that copies of his letters had been donated by their recipients to the libraries, he caused the letters to be registered for copyright protection in his name. On May 30, 1986, his attorneys wrote to Hamilton and Random House demanding that the book not be published unless and until all of Salinger's unpublished materials were deleted. Defendants then sought the libraries' permission to quote from the correspondence, but without success.

In response to Salinger's demand, Hamilton revised the book to reduce drastically the amount of direct quotation. He revised, rewrote or paraphrased most of the previously quoted material, limiting quotation to no more than 10% of any one letter and, in most cases, no more than 10 words from any one letter. In the new September proofs (Exh. D to the Timberman affidavit), there remain between 200 and 300 words of direct quotation, representing something between 0.8% and 2.0% of the content of the copyrighted correspondence. Because the Princeton, Harvard, and Texas libraries refused permission to quote from their letters, Hamilton eliminated all direct quotations from letters available only at those libraries. He retained certain quota-

tions from letters at Princeton that are also found in the Sublette bibliography.[1]

The September proofs use the letters as an important source to report Salinger's opinions, thoughts, feelings, and fantasies as a young man. A substantial percentage of the book consists of material learned by Hamilton from the letters.

By agreement with Salinger, defendants submitted the revised September page proofs to his attorneys on September 18, 1986. Salinger promptly brought suit, asserting that the biography infringes his copyrights and that he will be irreparably harmed if publication and distribution are allowed to proceed. On October 3, 1986, I granted a temporary restraining order to preserve the status quo. Defendants agreed to extend the TRO until today's date to permit discovery, submission of a hearing record, briefing and ruling on Salinger's motion for a preliminary injunction. For the reasons set forth below, that motion is now denied.[2]

### Discussion

1. *The Scope of Copyright Protection.*

The first question to be considered is whether and to what extent Hamilton's book takes material from Salinger's letters that is protected by the copyright. Salinger contends the taking goes far beyond the 200–300 quoted words. He contends that lengthy portions of numerous letters are tracked and paraphrased in a manner that misappropriates his copyrighted expression. He argues that the material so taken constitutes the "heart" not only of his letters, but also of Hamilton's book. *Cf. Harper & Row, Publishers, Inc. v. Nation Enterprises,* 471 U.S. 539, 105 S.Ct. 2218, 2233–34, 85 L.Ed.2d 588 (1985).

1. On September 24, 1986, plaintiff's attorneys wrote to Sublette and his publisher demanding that they delete all quotation and paraphrasing of Salinger's unpublished works before distributing any further copies of the bibliography. Salinger Aff. ¶ 23, ex. N. Plaintiff's attorneys were advised by the Princeton library that Sublette had not obtained library permission to quote the letters.

2. Although this lawsuit is directed against the May galleys as well as the new September galleys, the defendants have represented that there will be no further distribution of the text as it appeared in May. Accordingly, I have regarded the injunction motion as moot insofar as it may pertain to the earlier form of the text.

■ Salinger is correct that copyright infringement is not limited to verbatim quotation. Paraphrase that reproduces the original author's protected expression also is a violation. *See, e.g., Donald v. Zack Meyer's T.V. Sales and Service*, 426 F.2d 1027, 1030 (5th Cir.1970); *Davis v. E.I. DuPont de Nemours & Co.*, 240 F.Supp. 612, 621 (S.D.N.Y.1965).

■ On the other hand the copyright does not protect all of the material in an author's original work. The importance of free public dissemination of ideas and matters of historical fact dictates that they should not be subject to private ownership or control. It is therefore axiomatic that the copyright does not encompass facts or ideas. What is protected is the art, or craftsmanship—the author's particular manner of expression. *See, e.g., Reyher v. Children's Television Workshop*, 533 F.2d 87, 91 (2d Cir.1976) (*quoting* Chafee, *Reflections on the Law of Copyright*, 45 Colum.L.Rev. 503, 513 (1945)); *Peter Pan Fabrics, Inc. v. Martin Weiner Corp.*, 274 F.2d 487, 489 (2d Cir.1960).

■ To make a determination of the extent of taking of copyrighted material, it is therefore necessary to examine closely the comparison of the copyrighted and the accused passages, not only to determine the extent and nature of similarity but also to ascertain whether what was taken is in the protected category or in the unprotected realms of fact and idea. *See, e.g., Werlin v. Reader's Digest Ass'n*, 528 F.Supp. 451, 462 (S.D.N.Y.1981). To facilitate this test, plaintiff has submitted at the court's request a compilation of 59 instances of comparative texts representing "as complete a picture as possible" of the alleged infringements. (The list, set forth as Exhibit A to the Coleman affidavit of October 16, 1986, is hereafter referred to as "Exhibit A".)

■ The comparison reveals that the vast majority of the material taken by Hamilton from the letters is not copyright protected. Salinger's letters are full of information about his life upon which the biographer has drawn. Such information is not protected by the copyright. Unprotected information of this nature includes far more than the where, when and with whom. Information as to the subject's thoughts and feelings is vital historical fact for the biographer and belongs in the unprotected categories, so long as the biographer does not overstep permissible limits by taking the author's craftsmanship. *See, e.g., Meeropol v. Nizer*, 417 F.Supp. 1201, 1211 (S.D.N.Y.1976), *rev'd on other grounds*, 560 F.2d 1061 (2d Cir.1977), *cert. denied*, 434 U.S. 1013, 98 S.Ct. 727, 54 L.Ed.2d 756 (1978); *see also Harper & Row, Publishers, Inc. v. Nation Enterprises*, 723 F.2d 195, 105 & n. 14 (2d Cir.1983), *rev'd on other grounds*, 471 U.S. 539, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985). Furthermore, the ideas revealed in a copyrighted work are not protected by the copyright.

■ For the biographer to report in his own words Salinger's ideas drawn from the letters or the fact that Salinger was depressed, elated, or angry, does not violate the copyright. His resentment against literary critics who, having never taken the risks or braved the pains and difficulties of creative writing, presume to pass judgment on serious authors (Letter No. 34) may be drawn from his letter without infringement, both as an idea and as a historical fact. Likewise, his evaluations of Hemingway (Nos. 37 & 38); his difficulty sustaining his infatuations with girls (Nos. 23 & 32); his determination at one point to write for Hollywood and riches (No. 26); his reticence to yield any of his freedom by accepting an advance (No. 28), etc.

I find that virtually every passage taken by Hamilton from the 59 letters consists primarily of a report of such historical fact (or of an idea) which is not protected by the copyright.

■ That does not end the inquiry. As noted, the license to report historical fact and idea found in copyrighted material does not carry with it the right to employ the originator's particular words or manner of expression; these are protected by the copyright. *See Nation*, 105 S.Ct. at 2232–33; *Hoehling v. Universal City Studios,*

*Inc.,* 618 F.2d 972, 980 (2d Cir.1980), *cert. denied,* 449 U.S. 841, 101 S.Ct. 121, 66 L.Ed.2d 49 (1980). Whether there is infringement does not necessarily turn on whether there is direct quotation. If, for example, the original work quotes a third person (as where Salinger in Letter No. 7 quotes from a rejection letter he received in 1940 from *Esquire*), that quotation is a historical fact, it is not an original creation of the copyright holder, and it may be requoted without infringement. Also, the copyright applies only to original creation and not to cliche or ordinary unoriginal combinations of words. *See* W. Patry, *Latman's The Copyright Law* 23–24 (1986). Although Salinger's letters are predictably vibrant and full of originality of image, metaphor and expression, even he occasionally (albeit rarely) employs a cliche or a word-combination that is so ordinary that it does not qualify for the copyright law's protection.

Thus where Salinger describes himself as one who "could never even put a Tinker-Toy together" (No. 21), or states that he "miss[es] [his] little typewriter terribly" (No. 17), or describes a work as "the religious book of the century" (No. 52), Hamilton's quotation of those words does not implicate the copyright.

■ On the other hand, the author's own original image, choice of words, and turn of phrase are protected and there will be infringement (absent justification) when they are appropriated whether by direct quotation or by paraphrase.

■ A few examples follow (all references to Hamilton's text are to a xerox copy of proofs submitted as defendants' Exh. D) (emphases supplied):

| Salinger | Hamilton |
| --- | --- |
| Describing Wendell Willkie as a phoney, adds that he looks "like a guy who makes his wife keep a scrapbook for him." (No. 11) | "the sort of fellow who makes his wife keep an album of his press cuttings." (p. 47) |
| As to why he writes under J.D., complains that Jerome is a lousy name. "It always sounds so much like Jerome . . . . (No. 12) | ". . . Jerome was such a dreadful name: however you said it, Jerome always came out sounding like Jerome." (p. 48) |
| The men in my tent—though a damn nice bunch—are always eating oranges or listening to quiz programs . . . . (No. 18) | (Substantially quoted on p. 57.) |
| About a novel he has wanted to write since he was 17, "until I can get icy about the whole thing . . ., I'm not going to touch it. I'm getting colder and colder on it. Won't be long. (No. 29) | "Salinger wants to feel like ice about this book . . . . And he is prepared to wait. The iciness is deepening, and he feels that he will soon be cold enough to make a start." (pp. 67–68) |
| "[E]verybody over here who's ever taught Senior English for a couple of semesters, or worked for a good upholsterer, has considered himself qualified to collect and edit a short story anthology." (No. 57) | "[A]nybody who has 'ever taught Senior English,' however briefly, or been employed by 'a good upholsterer' has reckoned himself to have the perfect skills for putting together an anthology of shorter fiction." (p. 157) |
| Describing his life as a soldier in the counter-intelligence corps in Germany after its fall, he writes that he and his new wife have bought a sportscar, and that his big black dog Benny "rides on the running board, pointing out Nazis for me to arrest." (No. 40) | "The couple have . . . a large dog called Benny. Benny rides with them in the car and lets them know if he spots any arrestable Nazis." (p. 91) |

[See also in No. 39 and at Hamilton, p. 89–90, the reference to being publicly cremated in front of the offices of the Saturday Evening Post in retribution for "treasonous" thoughts; Salinger's bitter fantasy of the domesticity of his once beloved Oona O'Neill with her new aged husband Charlie Chaplin (No. 24 and Hamilton, p. 65); "If [the liberating Americans] had stood on top of the jeep and taken a leak, Paris would have said, 'Ah, the darling Americans! What a charming custom!' " (No. 36, Hamilton p. 82).]

As to each of these passages, the biographer has gone beyond the permissible report of a historical fact or an idea and has reproduced an image, literary device, metaphor or choice of words that is protected by the copyright. In total I have found approximately 30 letters from which Hamilton has taken, either by brief quotation or paraphrase, a few words of copyright protected material. Unless excused under the doctrine of fair use, or found to be too insignificant in net effect to justify a cause of action, these represent instances of infringement and a possible basis for injunction.

### 2. *Fair Use.*

Despite Hamilton's use of copyright protected material from the letters, his book is not guilty of infringing if those quotations and paraphrases are found to be "fair use." " 'Fair use' is a 'privilege in others than the owner of a copyright to use the copyrighted material in a reasonable manner without his consent....' " *Rosemont Enterprises v. Random House, Inc.*, 366 F.2d 303, 306 (2d Cir.1966) (*quoting* Ball, *Copyright and Literary Property* 260 (1944)). It is described as an "equitable rule of reason." House Report No. 94–1476, 94th Cong., 2d Sess. 66, 1976 U.S.Code Cong. & Ad.News

5659, 5680 (hereinafter "House Report"). The rule is codified at 17 U.S.C. § 107 (1982):

> [T]he fair use of a copyrighted work, including such use by reproduction in copies ... for purposes such as criticism, comment, news reporting, ... scholarship, or research, is not an infringement of copyright. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include—
>
> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
>
> (2) the nature of the copyrighted work;
>
> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
>
> (4) the effect of the use upon the potential market for or value of the copyrighted work.

These factors were distilled from the common law and were not intended as exclusive. Instead, they are the focus of a factual inquiry to determine whether the particular use of copyrighted material should be considered fair and lawful.[3]

A. *Is the Fair Use doctrine applicable to unpublished work?* Plaintiff contends that the privilege of fair use has no application to unpublished work. Common law traditionally protected the author's decision "whether and in what form to release his work," *Nation*, 105 S.Ct. at 2227, including unpublished letters. *See, e.g., Birnbaum v. United States*, 588 F.2d 319, 326 (2d Cir.1978). A leading New York case defined common-law copyright as

> an author's proprietary interest in his literary or artistic creations before they

**3.** The House Report states:

The bill endorses the purpose and general scope of the judicial doctrine of fair use, but there is no disposition to freeze the doctrine in the statute, especially during a period of rapid technological change. Beyond a very broad statutory explanation of what fair use is and some of the criteria applicable to it, the courts must be free to adapt the doctrine to

particular situations on a case-by-case basis. Section 107 is intended to restate the present judicial doctrine of fair use, not to change, narrow, or enlarge it in any way. House Report at 66, U.S.Code Cong. & Ad.News at 5659, 5680. *See also* S.Rep. 94–473, 94th Cong., 1st Sess. 62 (1975) (hereinafter "Senate Report").

have been made generally available to the public. It enables the author to exercise control over the first publication of his work or to prevent publication entirely....

*Estate of Hemingway v. Random House, Inc.*, 23 N.Y.2d 341, 345–46, 296 N.Y.S.2d 771, 776 (1968).

In the Copyright Revision Act of 1976, Congress extended federal protection to the right of first publication. *See* 17 U.S.C. § 106 (1982). The privilege implicates both the author's "personal interest in creative control" and "his property interest in exploitation of prepublication rights." *Nation*, 105 S.Ct. at 2228. Although "common-law copyright was often enlisted in the service of personal privacy," *id.*, Congress was specifically concerned that the copyright owner "have the right to control the first public distribution of an authorized copy ... of his work." House Report at 62, 1976 U.S.Code Cong. & Ad.News at 5675.

In the *Nation* case, the Supreme Court held that *"[u]nder ordinary circumstances, the author's right to control the first public appearance of his undisseminated expression will outweigh a claim of fair use."* 105 S.Ct. at 2228 (emphasis added). "[T]he scope of fair use is narrower with respect to unpublished works." *Id.* at 2232. Thus, "the unpublished nature of a work is '[a] key, *though not necessarily determinitive, factor'* tending to negate a defense of fair use." *Id.* at 2227–28 (*quoting* Senate Report at 64 (emphasis added by this court). *See also* Note, *Copyright and Privacy Protection of Unpublished Works—The Author's Dilemma*, 13 Colum.J.L. & Soc.Probs. 351, 377 (1977). The Court, however, stressed the tailoring of fair use analysis to the particular case. *See* 105 S.Ct. at 2227. It neither stated nor implied a categorical rule barring fair use of unpublished works. *See* Nimmer § 13.-05[A][2], at 13–74 to 13–77. *But see Nation*, 105 S.Ct. at 2249 (Brennan, J., dissenting); *Sinkler v. Goldsmith*, 623 F.Supp. 727, 732 (D.Ariz.1985). Indeed, the Court proceeded to evaluate the *Nation*'s

use of Gerald Ford's unpublished manuscript in terms of all the statutory fair use factors.

Few recent decisions have involved unpublished works. Citing the *Nation* opinion, the *Sinkler* court granted summary judgment in favor of the copyright counterclaimant because the letters in issue had not previously been published or widely disseminated. The Arizona District Court held that the fair use doctrine "generally applies to materials already released by an author for public consumption." 623 F.Supp. at 732. The Second Circuit, on the other hand, earlier held a newspaper's publishing of a copyrighted letter to the editor to be a fair use. *Diamond v. Am-Law Pub. Corp.*, 745 F.2d 142 (2d Cir.1982). The *Diamond* court did not even regard the unpublished nature of the letter as a factor, perhaps because the plaintiff desired publication and complained merely of the paper's editing of his letter.

Courts have also applied the fair use doctrine to cases involving unpublished architectural plans and medical school admissions test questions (although ruling in these cases against defendants). *Schuchart & Assocs. v. Solo Serve Corp.*, 220 U.S.P.Q. 170, 180 (W.D.Tex.1983) (scope of fair use of the plans narrower than with respect to published works, even though the plaintiff had not kept the plans confidential); *Aitkin, Hazen, Hoffman, Miller, P.C. v. Empire Constr. Co.*, 542 F.Supp. 252, 260 (D.Ne.1982) (court ignored the unpublished nature of the plans, but emphasized that developer had destroyed the copyright owner's only potential market for its work by exploiting an exact copy of the plans for a particular project); *Association of American Medical Colleges v. Mikaelian*, 571 F.Supp. 144, 151–53 (E.D.Pa.1983) (test questions were developed under strict security and commercial exploitation of the questions to prepare students for taking the test destroyed their value to the copyright holder); *aff'd without opinion*, 734 F.2d 3 (3d Cir.1981).

More on point are the opinions of New York state courts in a suit to enjoin the

publication of a biography of Ernest Hemingway. The writer's wife and estate invoked a common-law copyright in Hemingway's unpublished letters. First, in denying the application for a preliminary injunction, the court suggested that the absence of direct quotation from the letters rendered any copyright infringement de minimis. *Estate of Hemingway v. Random House, Inc.*, 49 Misc.2d 726, 268 N.Y.S.2d 531, 536 (N.Y.Co.), *aff'd without opinion*, 25 A.D.2d 719, 269 N.Y.S.2d 366 (1st Dep't 1966). On the defendant's later motion for summary judgment, however, the court considered the question of fair use. In addition to reiterating that defendants had not quoted verbatim, the court emphasized the biographical purpose for using the letters, the nature of plaintiffs' literary property, and the absence of any harm to the market for the letters. 53 Misc.2d 462, 279 N.Y.S.2d 51, 57–58 (N.Y.Co.), *aff'd without opinion*, 29 A.D.2d 633, 285 N.Y.S.2d 568 (1st Dep't 1977), *aff'd on other grounds*, 23 N.Y.2d 341, 296 N.Y.S.2d 771, 244 N.E.2d 341 (1968).[4] Plaintiff here argues, citing W. Patry, *The Fair Use Privilege in Copyright Law* 440–41 (1985), that the *Hemingway* court found only that the copying was de minimis. In dismissing the common-law copyright claim, however, the court considered all four of the fair use factors now enumerated in 17 U.S.C. § 107, of which the amount and substantiality of the use is one. I read it as a finding of fair use, as well as of de minimis.

■ In my view, plaintiff's argument that there may be no fair use of an unpublished work is exaggerated and unreasonable. Of course, fair use protection should be sparingly accorded to quotation from unpublished work lest such use effectively deprive the creator of his right to exercise reasonable control over his own artistic reputation and over the initial presentation of his work. However, where the proposed use is of such character that it would not affect those interests of the copyright holder, no good reason can justify so extreme a rule as would absolutely bar the fair use of unpublished matter. As the name of the rule implies, it looks to the *fairness* of the secondary reference. If this *unfairly* interferes with the creator's reasonable enjoyment of his right of literary property, it will be enjoined. If, on the other hand, the secondary use is fair, giving due regard for the creator's right to control the first publication, it will be permitted. That the work is unpublished is an important factor, but it is not the end of the inquiry.

■ I agree with Salinger's counsel that the right of initial publication is entitled to preservation where it is exercised for the purpose of withholding publication, as well as where it is exercised to control the manner of initial presentation. The copyright concerns itself not only with assuring the creator of original work of the right to reap the profits. It concerns itself also with the establishment and maintenance of artistic reputation. *See Schnapper v. Foley*, 667 F.2d 102, 114 n. 5 (D.C. Cir.1981) (citing Note, *An Author's Artistic Reputation Under the Copyright Act of 1976*, 92 Harv.L.Rev. 1490 (1979)), *cert. denied*, 455 U.S. 948, 102 S.Ct. 1448, 71 L.Ed.2d 661 (1982). In this sense the copyright shares something in common with trademark in that each serves to identify to

---

4. The New York Court of Appeals asserted in dictum that there is a freedom not to speak publicly that parallels the common-law copyright in written materials. The Court nonetheless indicated that there is no categorial distinction between published and unpublished works with respect to fair use:

The indispensable right of the press to report on what people have *done,* or on what has *happened to* them or on what they have *said in public* does not necessarily imply an UNBOUNDED freedom to publish whatever they may have *said in private conversation,* any more than it implies a freedom to copy and publish what people may have put down in *private writings.*

Copyright, BOTH common-law and statutory, rests on the assumption that there are forms of expression, limited in kind, to be sure, which should not be divulged to the public without the consent of their author. The purpose, far from being restrictive, is to encourage and protect intellectual labor.

*Id.* at 347–48; 296 N.Y.S.2d at 778, 244 N.E.2d at 348 (emphasis in original) (boldface added) (citations omitted).

the public the products coming from a particular source. By the act of publication under his name, the creator risks his reputation in the work. By the same token, if a writer believes that his draft is not up to snuff and does not wish to subscribe to it, his copyright permits him to suppress its publication. *See Hemingway,* 296 N.Y. S.2d at 776, 244 N.E.2d at 346. He may not, of course, suppress publication by others of the ideas or the information contained in it, as these are not covered by the copyright. But he may bar unauthorized publication of his unpublished work, even if it is his hope to keep it from being published forever. Thus my finding in Hamilton's favor on the subject of fair use is not based on a perception that, as defense counsel have argued, the copyright holder may not seek to enforce his right of first publication unless he intends to make such publication.

B. *Is this Fair Use?*

■ Upon full consideration of the factors that bear on the question of fair use, it is my view that defendants have made a sufficiently powerful showing to overcome plaintiff's claims for an injunction. The reasons that support this finding are: Hamilton's use of Salinger's copyrighted material is minimal and insubstantial; it does not exploit or appropriate the literary value of Salinger's letters; it does not diminish the commercial value of Salinger's letters for future publication; it does not impair Salinger's control over first publication of his copyrighted letters or interfere with his exercise of control over his artistic reputation. The biographical purpose of Hamilton's book and of the adopted passages are quite distinct from the interests protected by Salinger's copyright. Finally, although both Hamilton and Random House no doubt hope to realize profit from the sales of the book, it is a serious, carefully researched biography of an important literary figure (of whom little is known); its publication is of social and educational value.

(i) *Extent of Appropriation.* The "amount and substantiality" of the use of the copyrighted work is a factor specified by the statute. As noted above, Hamilton's main drawings from Salinger's letters are of biographical material that is not protected by the copyright. If one looks at the totality of the material drawn from the letters, it is no doubt true, as plaintiff argues, that Hamilton has taken important matter from them. But for this inquiry we must distinguish between what is copyright protected and what is not. Although a large amount of *information* is taken from the letters, and is of vital importance to the book, the information is not protected by the copyright.

The appropriate quantitative and qualitative analysis is directed to Hamilton's taking of copyright protected matter. This is limited to about 30 instances of the use of a word or a phrase or an image. These instances rarely involve more than a few words of Salinger's copyright protected material. In the rarest case, a complete sentence is taken (see No. 3). These passages are not the heart of Salinger's letters, nor of Hamilton's book. The taking of copyright protected matter is insignificant.

There can be no doubt these passages improve Hamilton's book. It is, after all, the biography of a powerful writer. The history is more lively and true to the extent that it uses Salinger's own sharp images in preference to a neutered description of his thoughts or feelings. It certainly tells more about Salinger to read his acid quip that anyone who has worked for "a good upholsterer" considers himself qualified to edit a short story anthology (No. 57), than to be told that he resented the presumption of unqualified editors.

Hamilton's testimony suggests he agrees that he did not improve his book by eliminating and writing around most of the quoted matter that appeared in the May galleys. But what he did accomplish was to reduce from a large number to fewer than 30 the instances of use of copyrighted expression. He has thus very substantially improved his entitlement to claim fair use.

The few and brief instances that remain add color and accuracy of detail to the

portrait of Salinger. They do not give the reader the sense that she has read Salinger's letters. They do not give the reader a basis to evaluate Salinger's skills as a writer. The excerpting of these details does not interfere with Salinger's control over initial publication.

(ii) *Difference of Purpose and Effect on Market.* Hamilton's work is biographical; it is neither a presentation, nor even a critique of Salinger's work. The Salinger letters serve Hamilton primarily as a source of biographical information and detail and not as a reservoir of Salinger literature to be revealed in Hamilton's book. A biographical subject's letters can play an important role in filling out the history or portrait, the internal life of the subject—his thoughts, opinions, moods and feelings. But the use of letters as a source poses a dilemma for the biographer. To the extent he quotes (or closely paraphrases), he risks a finding of infringement and an injunction effectively destroying his biographical work. To the extent he departs from the words of the letters, he distorts, sacrificing both accuracy and vividness of description.

Courts have thus recognized the legitimacy of use of excerpts from copyrighted letters in service of a biographical portrait, *see, e.g., Hemingway,* 279 N.Y.S.2d at 58; *Meeropol,* 417 F.Supp. at 1211–12, but at the same time, they have warned against going too far. *Meeropol,* 560 F.2d at 1069–71 (reversing grant of summary judgment to defendants because of factual uncertainties with respect to the substantiality of the use, the purpose of copying entire letters and long passages verbatim, and the effect of the book's publication on the future market for the letters). A biographical purpose will not excuse "extensive verbatim copying or paraphrasing" of copyrighted matter. *Rosemont,* 366 F.2d at 310; *see also Iowa State U. Research Foundation, Inc. v. American Broadcasting Cos.,* 621 F.2d 57, 60–61 (2d Cir.1980).

George Washington's copyrighted letters were found by Justice Story in 1841 to form a substantial part of an infringing biography. *Folsom v. Marsh,* 9 Fed.Cas. No. 4901 p. 342 (C.C.D.Mass.). Justice Story held that there could be no fair use of letters in a historical work if "the value of the original is sensibly diminished or the labors of the original author are substantially appropriated." Letters "may be inserted as a sort of distinct and mosaic work, into the general texture of the second work, and constitute the peculiar excellence thereof, and then it may be a clear piracy." *Id.* at 348, quoted in *Meeropol,* 560 F.2d at 1070. Justice Story added, however,

> It is not a case where abbreviated or select passages are taken from particular letters; but the entire letters are taken, and those of most interest and value to the public.... If it had been the case of a fair and bona fide abridgement of the work of the plaintiffs, it might have been admitted of a very different consideration.

*Id.* at 349, quoted in *Meeropol,* 417 F.Supp. at 1212.

What is therefore required is careful case-specific analysis whether, on all the factors, the biographer's use of copyrighted expression has been fair and reasonable or whether it has trespassed excessively on the copyright. *See Meeropol,* 560 F.2d at 1069–71. Such examination demonstrates the reasonable scope and purpose of Hamilton's appropriations.

How copying affects the marketability of the copyrighted work was described in *Nation,* 105 S.Ct. at 2234, (*citing* 3 Nimmer § 13.05(A)(4), now at 13–79) as "undoubtedly the single most important element of fair use." This issue is not merely a matter of quantifying damages. *See* 3 Nimmer § 13.05(A)(4) at 13–79 n. 35.1a. The creator's right to the publication of his copyrighted material involves many factors (including artistic reputation and control of first presentation) that are not wholly compensable by an award of damages. Also, the emphasis is on marketability and commercial value, rather than actual market. Thus, Salinger's intention not to publish does not moot the issue.

On the other hand, the marketability to be considered is the marketability of what the copyright protects, not of the unprotected matter to be found in the copyrighted work. And the issue is whether any effect on marketability of the copyrighted work was brought about *by the use of copyrighted matter* rather than by other factors. *See Nation*, 105 S.Ct. at 2252–53 (Brennan, J., dissenting). Thus, if a copyrighted author sues a book reviewer for infringement and the reviewer defends on grounds of fair use, the negative effect on the marketability of the book that results from the reviewer's low opinion of it is not the market effect of which the rule speaks. What the rule concerns is negative effect on the marketability of the copyrighted work resulting from the sense on the part of the readership that they have already read it in the other publication.

Readers may be drawn to purchase a publication of Salinger's letters for at least two distinct reasons. One reason is the reader's desire to read Salinger's work. A second reason may be the reader's interest in acquiring information about Salinger's early life.

The copyright law and the question of fair use concern themselves with the readers in the first category. If Hamilton's book revealed the literary content of Salinger's letters to such degree that any appreciable number of potential purchasers in the first category would be dissuaded from buying the letters, feeling that they had already read them in Hamilton, that would argue strongly against a finding of fair use. In my view, however, Hamilton's use of Salinger's copyright protected matter is so slight that it in no way diminishes the marketability of Salinger's letters among readers of Salinger.

There may be an effect on the readership motivated only by the second desire. A person drawn to purchase Salinger's letters only by the desire to learn more about Salinger's life might find that her biographical interest had been satisfied by the information conveyed in Hamilton. This readership may indeed be affected, but only by

Hamilton's report of unprotected, historical facts, not by his use of copyright protected expression.

I conclude that Hamilton's limited use of copyright protected passages from Salinger's letters would have no effect on the marketability of the letters, as contemplated by the fair use statute.

(iii) *Commercial v. Educational.* "[F]air use ... for such purposes as criticism, comment, news reporting ... scholarship or research is not an infringement.... [T]he factors to be considered shall include ... whether such use is of a commercial nature or is for nonprofit educational purposes...." 17 U.S.C. § 107 (1982). In so saying, the statute somewhat unrealistically paints the world into two corners—the venal commercial and the altruistic instructive. In fact, publishers of educational textbooks are as profit-motivated as publishers of scandal-mongering tabloid newspapers. And a serious scholar should not be despised and denied the law's protection because he hopes to earn a living through his scholarship. The protection of the statute should not turn on sackcloth and missionary zeal. It rather directs the court to make an appraisal of social usefulness and of commercial fair play. Notwithstanding the hopes undoubtedly shared by Hamilton and his publisher for the best seller list and its monetary rewards, this factor favors the defendants. *Cf. Maxtone Graham v. Burtchaell*, 803 F.2d 1253, 1262 (2d Cir. 1986); *Consumers Union v. General Signal Corp.*, 724 F.2d 1044, 1049 (2d Cir. 1983), *cert. denied*, 469 U.S. 823, 105 S.Ct. 100, 83 L.Ed.2d 45 (1984); *Rosemont*, 366 F.2d at 307.

As an extraordinarily talented and fascinating author, Salinger is a figure of great public interest. His novels are among the most widely admired and sold of the last quarter century. Because of his firmly maintained wish for privacy, little is known of him. Although his desire for privacy is surely entitled to respect, as a legal matter it does not override a lawful undertaking to write about him using legally available resources.

Hamilton's book cannot be dismissed as an act of commercial voyeurism or snooping into a private being's private life for commercial gain. It is a serious, well-researched history of a man who through his own literary accomplishments has become a figure of enormous public interest. This favors a finding of fair use.

The *Nation*, on which plaintiff relies heavily, is easily distinguished. There the defendant had deprived the copyright licensee of commercial value by a gun-jumping publication that pirated "the heart" of the copyrighted work. The market for the copyrighted work was seriously affected. Those factors played a powerful role in the Supreme Court's decision. *See* 105 S.Ct. at 2232–35. None of them is present here.

(iv) *Equitable Factors.* Salinger argues further that unfair conduct on Hamilton's part in disregarding the library agreements should disqualify him from receiving the benefits of the equitable fair use doctrine. This is the only point on which I find Hamilton's position less than wholly persuasive. He contends his conduct was justified by his understanding that the requirement of permission applied only to infringement of copyright and that, because of the fair use doctrine, the material he took from the letters involved no infringement. As discussed below, I am inclined to agree with his understanding of the library agreements. And had the initial draft of his book been similar to its present modified form, his second point would be more convincing. Given the extensive quotation from the letters that appeared in the May galleys, Hamilton was certainly giving himself a generous benefit of the doubt in concluding that the library agreements did not call for permissions.

The issue does not easily admit of a clear finding. But even assuming an ultimate conclusion that Hamilton was cavalier about the need for permissions, that would not justify enjoining his book in its present form.

In my view, the use of copyrighted matter in the present form of the book is so minimal and the case favoring a finding of fair use is so convincing that an injunction cannot be justified, even if it were found that Hamilton showed more solicitude for his own interests than for Salinger's in dealing with the library agreements.

### 3. *De Minimis*

If there were some impediment to a finding of fair use—such as, for example, plaintiff's extreme contention that fair use has no application to unpublished work, it would be necessary to consider whether the extent of infringement was too insignificant to justify enjoining Hamilton's biography. Enjoining publication of a book is a serious matter. With all respect for the rights of a copyright owner, a publication should not be enjoined where the degree of infringement is trifling and inconsequential. *See Rosemont,* 366 F.2d at 306, 311; *Belushi v. Woodward,* 598 F.Supp. 36, 37–38 (D.D.C.1984); *Estate of Hemingway,* 268 N.Y.S.2d at 534, 536. Because I find fair use so clearly established, I need not reach a finding on whether, absent fair use protection, the infringement would be so insignificant as to warrant the denial of even a preliminary injunction. In all likelihood, Hamilton would prevail on this issue.

Hamilton's use of copyrighted expression is so minimal, it is difficult to perceive any harm to Salinger. The wound he has suffered is not from infringement of his copyright but from the publication of a biography that trespasses on his wish for privacy. The copyright law does not give him protection against that form of injury.

### 4. *Lanham Act Claim*

Salinger also alleges that defendants have violated § 43(a) of the Lanham Act. 15 U.S.C. § 1125(a) (1982). He argues that the biography's quotations and paraphrases, often introduced by such words as "Salinger said," are likely to mislead the reading public into believing that Salinger was interviewed for and sponsored the biography.

The contention is without merit. The reader could not reasonably infer that the

biography had benefitted from interviews of Salinger. In the first place, Salinger's present and long-standing reclusive unavailability to the world is one of its dominant themes. Hamilton makes no pretense of having interviewed Salinger. In the epilogue, for example, Hamilton attributes to a reliable, but undisclosed, source that Salinger, since withdrawing all his works from publication, has written two full-length manuscripts which he keeps locked in a safe (pp. 194–95). In the course of the narrative, Hamilton recounts an incident in 1953 in which Salinger, having moved to Cornish, New Hampshire and befriended the local high school kids, agreed to give two of the girls an interview for the high school page of the local newspaper. Hamilton reports Salinger's sense of betrayal when that interview appeared as a scoop on the front page of the local paper. Hamilton adds, "It was the last interview Salinger has ever given to anyone." (pp. 138–39.)

■ Also, under § 43(a), Salinger contends that Hamilton has presented him misleadingly by distorting paraphrase. This is a Catch–22 claim: If Hamilton used Salinger's words, he violated the copyright act; if he avoided using Salinger's words, he violated the Lanham Act. There is, however, no showing of distortions that would give rise to a Lanham Act claim. *Cf. Gilliam v. American Broadcasting Cos.*, 538 F.2d 14, 23–25 (2d Cir.1976).

## 5. *Third-Party Beneficiary Contract Claim*

■ Salinger also alleges that Hamilton violated his rights as a third-party beneficiary under agreements Hamilton made with libraries to gain access to his correspondence. This claim is independent of the copyright contentions. In my view, however, the intention and scope of those agreements are to protect the literary property interests of the owner and not to give the copyright owner an arbitrary power to block legitimate non-infringing use.

Although a few words considered out of context may seem to imply a more extreme purpose, the full text of the library agreements (including in the case of Texas the accompanying "Information for Manuscript Readers") makes clear that their purpose is to safeguard literary property rights.[5] Although the precise text of the Harvard and Texas agreements seem to go farther than Princeton in restricting the researcher from "quot[ing]" (Texas) or publishing "any excerpt" (Harvard), this restriction should be understood as applying only to quotations and excerpts *that infringe copyright.* To read them as absolutely forbidding any quotation, no matter how limited or appropriate, would severely inhibit proper, lawful scholarly use and place an arbitrary power in the hands of the copyright owner going far beyond the protection provided by law. Often, for example, an idea cannot be reported accurately without some quotation. To require the historian or commentator to paraphrase would simply cause inaccuracy and misunderstanding, impeding scholarship. I believe it would be unreasonable to construe the library agreements as so far-reaching. In any event, the new September proofs have eliminated all direct quotation from the Harvard and Texas letters.[6]

In view of my understanding of the scope of these agreements, I need not

---

5. Indeed, the libraries are concerned that they not be exposed to copyright claims against them. Thus the Princeton agreement requires that the researcher "assume all responsibility for any infringement by [him] of the literary property rights held by others in the material requested." Salinger Aff., ex. E. Similarly, the Harvard application provides that he "agree to indemnify and hold harmless the University, its officers, employees and agents from and against all claims made by any person asserting that he is an owner of the copyright." *Id.* ex. G.

6. Salinger also contends that Hamilton has violated the further conditions set forth in a letter to Hamilton from Gerald Gunther, the custodian of the Hand papers for the Harvard library. The submissions, however, fail to establish that Gunther's letter constituted an additional contract, supplementing the Harvard library agreement that it refers to. And even if it did, it is the sense of Gunther's letter that "actual quotation" would require a further permission. The September proofs do not quote from those letters.

reach the defendants' contention that Sublette's prior publication of quotes from the Princeton library freed those materials for Hamilton's use. In any event, the Princeton agreement does not expressly forbid "quotation."

### 6. *The Standards for Preliminary Injunction*

■ A preliminary injunction may be granted in this Circuit only upon a showing of irreparable harm and either (1) likelihood of success on the merits, or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation, together with a balance of hardships tipping decidedly toward the party requesting the preliminary relief. *Jackson Dairy, Inc. v. H.P. Hood & Sons*, 596 F.2d 70, 72 (2d Cir.1979); *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, 604 F.2d 200, 204–05 (2d Cir.1979). The standard for preliminary relief is less demanding than for a permanent injunction. Nonetheless, Salinger has not made the showing required for a preliminary injunction. I find for the defendants on every issue.

Salinger has demonstrated no likelihood of success. To the contrary, I believe the defendants have so far shown their likelihood of success that it is doubtful whether plaintiff prevails on the first factor of the second branch—a showing of fair grounds for litigation. I need not resolve that issue, however, because plaintiff has shown neither irreparable harm nor the balance of hardships tipping decidedly in his direction.

Hamilton's appropriations of copyrighted expressions are too minimal to subject Salinger to any serious harm. There is no substantial revelation of the copyright protected aspects of his letters. There is no adverse impact on their market value as literature by Salinger.

The adverse impact on defendants from a preliminary injunction, on the other hand, would be substantial. *Cf. Belushi*, 598 F.Supp. at 37. The book is in print awaiting distribution. The lengthy delays that might result from waiting for appeals and for final trial on the merits might seriously impair the marketability of the book. First publication licenses optioned to *The New York Times Sunday Magazine* would be imperiled. The balance of hardships favors the defendants.

In addition, both sides acknowledge there is little or no significant evidence to be added at final trial that might justify a temporary stay awaiting the collection of the full evidence.

Upon all the factors, the application for a preliminary injunction is denied.